In re: BAKER & GETTY FINANCIAL SERVICES, INC., Debtor.

WESBANCO BANK BARNESVILLE, Plaintiff–Appellant/Cross–Appellee,

v.

Carl D. RAFOTH, Trustee, Defendant,

Customer Creditors, Defendant–Appellee/Cross–Appellant,

Mark Hocevar, Theresa M. Frissora, Defendants.

Nos. 96–3030, 96–3077.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 3, 1996.

Decided Feb. 12, 1997.

Rehearing Denied March 7, 1997.

Robert M. Morrow (argued and briefed), Columbus, OH, for Plaintiff-Appellant/Cross-Appellee.

Carl D. Rafoth, Friedman & Rummel Company, Youngstown, OH, Trustee.

Russell A. Kelm (argued and briefed), Law Offices of Russell A. Kelm, Columbus, OH, for Defendant-Appellee/Cross-Appellant.

Before: ENGEL, BROWN, and COLE, Circuit Judges.

BAILEY BROWN, Circuit Judge.

WesBanco Bank of Barnesville, Ohio ("WesBanco") appeals a judgment by the district court, in which the court affirmed an earlier decision of the bankruptcy court, instructing the trustee to distribute the assets of Baker & Getty Financial Services, Inc., Baker & Getty Diversified, Inc., Baker & Getty Securities, Inc., Philip Cordek and Suzan Cordek, collectively known as the "debtors," pursuant to the stockbroker liquidation provisions of the National Bankruptcy Review Act of 1987, 11 U.S.C. §§ 741–752 (1978). WesBanco contends that the district court, by so ruling, erred in determining that the debtors were "stockbrokers" under 11 U.S.C. § 101(53A). "Customer Creditors," investors who entrusted money with the debtors for the purpose of purchasing stock, respond that the district court correctly classified the debtors as stockbrokers. In addition, Customer Creditors cross-appeal a marginal entry order by the district court, in which the district court refused to strike references to the deposition testimony of Daniel Schwenker and Philip Cordek from the record on appeal and from WesBanco's brief. For the following reasons, we **AFFIRM** the district court's order characterizing the debtors as "stockbrokers" and applying the stockbroker liquidation provisions and, therefore, we need not decide the issue raised by Customer Creditors in the cross-appeal.

## I. FACTS AND BACKGROUND

In August 1985, Philip Cordek and Steven Medved formed Baker & Getty Financial Services, Inc. ("BGFS"), a stock brokerage and financial services firm. Medved and Cordek assumed the primary duties of organizing the business after its incorporation. By December 1985, Medved formed Baker & Getty Diversified, Inc. ("BGD") to obtain funds from various institutions and in turn loan the funds to BGFS. BGD also developed real estate investment opportunities for the customers of the brokerage firm. In May 1986, Baker & Getty Securities, Inc. ("BGS") was formed to replace BGFS and BGD because of problems encountered regarding the licensing procedures for BGFS as a securities firm. For purposes of this opinion, we will refer, as do the parties and the courts below, to the three Baker & Getty corporations collectively as "B & G."

Throughout 1985 and 1986, B & G solicited customers to purchase securities. B & G advertised itself as a licensed broker-dealer and as a member of the Securities Investor Protection Corporation, and, in addition, B & G encouraged its stockbrokers to tell prospective customers that B & G was a full-service brokerage firm, capable of conducting transactions in-house. In truth, however, B & G was neither a licensed broker-dealer nor

a member of the Securities Investor Protection Corporation. Instead, B & G employed Mutual Services, Inc. ("Mutual Services"), a licensed broker-dealer, to conduct trades through a clearing house, Mesirow and Company Incorporated ("Mesirow"). Typically, B & G stockbrokers, who were also registered representatives of Mutual Services, placed orders with Mutual Services, and Mutual Services cleared the trades through Mesirow. After executing a trade, Mutual Services provided confirmation slips to both the investors and B & G stockbrokers, and commission checks to B & G stockbrokers. Thus, although investors who purchased stock from B & G licensed stockbrokers, Daniel Schwenker, David Perham, and Phil Hammond, received valid securities, they received them without knowledge of B & G's actual status.

At the same time Schwenker, Perham, and Hammond were conducting legitimate stock transactions, Philip Cordek was conducting illegitimate transactions. To attract business, Cordek told investors that his uncle, who resided in New York, had access to large blocks of common stock available for sale at a discount. Cordek told investors that he would purchase stock at a discounted price and then quickly sell it, thereby allowing the investors to make a substantial return on their investment. Relying on Cordek's representations, Customer Creditors paid various sums to B & G in order to take advantage of the alleged investment opportunities. Cordek in turn gained access to the funds as the sole signatory on the B & G bank accounts.[1]

Instead of purchasing the stocks as promised, however, Cordek pocketed the money and then paid returns to original investors by taking from principal sums contributed by new B & G investors. The result was a classic "Ponzi" scheme, an investment scheme in which investors are promised excessive returns on investments and where, typically, initial investors are paid the promised returns to attract additional investors.[2] In January and February 1986, Cordek purchased stock for himself through Perham and Mutual Services, Inc. with the money received from the "Ponzi" scheme. By November 1986, Customer Creditors had lost approximately $3 million.

Meanwhile, in August 1986, Cordek and Byron Rice, a long-time customer of WesBanco, approached the President of WesBanco, Charles Bradfield, to obtain a loan. Cordek and Rice borrowed $1.1 million to invest in the bond market.[3] WesBanco requested $200,000 in collateral to be presented at the closing; however, it only perfected its interest in collateral of the value of $55,000.[4] On the due date for the $1.1 million promissory note, Cordek told WesBanco that he could

1. Cordek used five bank accounts for business and personal matters, three accounts in the name of "Baker & Getty Diversified" and two accounts in Cordek's name. Cordek used corporate funds to: (1) purchase automobiles; (2) repay his educational loans; (3) purchase a boat; (4) pay for a home and improvements; (5) buy furniture, jewelry, and other personalty; and (6) pay for hotel rooms for guests attending his wedding. *Matter of Baker & Getty Fin. Servs., Inc.*, 78 B.R. 139, 141 (Bankr.N.D.Ohio 1987).

2. *See In re Indep. Clearing House Co.*, 41 B.R. 985, 995 n. 12 (Bankr.D.Utah 1984), *aff'd in part, rev'd in part*, 62 B.R. 118 (D.Utah 1986) for a detailed description of a "Ponzi" scheme and its history.

3. The original loan amount of $1 million was increased to $1.1 million in exchange for the right of Bradfield to personally benefit in the bond transaction. Bradfield entered into a separate agreement with Rice on the closing date, whereby Rice afforded Bradfield an opportunity to participate in the bond transaction, giving Bradfield the right to receive any profit derived from the investment of the additional $100,000.

4. Cordek pledged collateral to WesBanco that consisted of a mortgage on Cordek's home, titles to multiple automobiles, and a lien on a boat. WesBanco received an invalid mortgage when it failed to conduct a title search on the Cordek's home, which would have informed WesBanco that Suzan Cordek, not Philip Cordek, held title to the home. In addition, although WesBanco properly perfected security interests in some of the remaining collateral, these interests were void due to the fact that they were preferential transfers under 11 U.S.C. § 547. WesBanco also required Byron Rice to put up collateral. Rice presented WesBanco with sight drafts on various bank accounts, approximately $25,000 in jewelry and cash, and titles to vehicles from his automobile business. In sum, the collateral provided by both amounted to a value of $55,000. *In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d 712, 714–15 n. 3 (6th Cir.1992).

not make the payment because he had not sold the bonds purchased with the loan money. However, Cordek testified that, in truth, he sold the bonds for a loss and deposited the proceeds of the sale into his personal account. Later, WesBanco recovered $245,800 from B & G's accounts with the bank and $237,378 from Rice on the promissory note.[5]

On January 22, 1987, three defrauded individuals filed involuntary bankruptcy petitions against BGS, BGD, and BGFS. The petitions were not contested, and the bankruptcy court entered an order of relief against the three corporations on February 17, 1987. On April 28, 1987, Cordek and his wife were joined as affiliates. Then, on May 26, 1987, the bankruptcy court entered an order substantively consolidating the estates of B & G with those of Philip and Suzan Cordek. *Matter of Baker & Getty Fin. Servs., Inc.*, 78 B.R. 139 (Bankr.N.D.Ohio 1987).[6] The bankruptcy court substantively consolidated the estates of the debtors because of unrestricted and extensive commingling of Philip Cordek's personal assets with B & G's corporate assets. WesBanco, which had been a creditor of Philip Cordek, individually, but not of B & G, then became a creditor of B & G. Thus, WesBanco would not have been a creditor of B & G at all had it not been for Customer Creditors' efforts to substantively consolidate the estates of the Cordeks with the B & G estate.

After seven years of contested proceedings, the trustee began to focus on the distribution of the recovered assets. On July 1, 1994, the trustee filed a motion for instructions from the court as to the applicability of the stockbroker liquidation sections of the bankruptcy code, 11 U.S.C. §§ 741–752. In

particular, the trustee wanted to know whether he should distribute the assets of the estate under the general subchapter, 11 U.S.C. § 726, or the subchapter for liquidation of a stockbroker, 11 U.S.C. §§ 741–752. Under an 11 U.S.C. § 726 distribution, WesBanco, as well as the other general creditors, expected to receive approximately 60% to 70% of its total claim upon final distribution. Under 11 U.S.C. §§ 741–752, however, WesBanco would receive no return on its claim, while Customer Creditors received a full return. Brief for Appellant at 6.

After holding a full evidentiary hearing, the bankruptcy court concluded that the assets of the debtors be distributed under the stockbroker liquidation provisions, 11 U.S.C. §§ 741–752:

> There is no dispute that the Debtor defrauded investors. The evidence in the record, however, shows that Debtor did effect transactions in securities. At a hearing on this matter, counsel for the Customer Creditors called David Perham to testify that he engaged in the business of effecting stock transactions. Perham is a licensed stockbroker who worked for Debtor during the relevant period. Perham testified that he accepted money from customers and conducted transactions in securities. Perham further testified that he personally knew of other brokers performing similar functions. Furthermore, the Court is aware from other hearings in the bankruptcy case of instances where Debtor informed investors that it had bought and later sold securities for the investors' accounts. From this evidence, the Court concludes that Debtor has effected transactions in securities.

**5.** Although WesBanco recovered $245,800 from B & G, this court determined that $200,000 of the recovered sum was a preferential payment. Thus, WesBanco was entitled to only $45,800. *In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 723.

**6.** In response to the order of substantive consolidation, WesBanco filed a proof of claim on January 4, 1988 for $659,197.53, the principal amount outstanding on the $1.1 million note. The trustee filed an objection to the claim, asking the bankruptcy court either to disallow the claim because Cordek was only an accommodation party to the promissory note or equitably subor-

dinate WesBanco's claim to those of general unsecured creditors. On June 23, 1988, the bankruptcy court entered a final order that, although allowing WesBanco's claim, equitably subordinated it to those of the other creditors. On appeal, the United States District Court for the Northern District of Ohio reversed the bankruptcy order, concluding that the trustee failed to offer grounds justifying equitable subordination. This court subsequently affirmed the district court's determination. Consequently, WesBanco's claim assumed an equivalent position with the claims of other general creditors. *In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 714–15.

*Joint Appendix* at 138–39. On appeal, the district court reviewed the applicability of the stockbroker liquidation provisions and entertained Customer Creditors' motion to strike references to the deposition testimony of Schwenker and Cordek from WesBanco's brief and from the record on appeal. On July 31, 1995, the district court issued a memorandum opinion affirming the bankruptcy court's order and entered a marginal entry order denying the motion to strike. This appeal followed.

## II. STANDARD OF REVIEW

■ We review a bankruptcy appeal differently than a typical appeal from the district court. The bankruptcy court makes initial findings of fact and conclusions of law. The district court then reviews the bankruptcy court's findings of fact for clear error and the bankruptcy court's conclusions of law *de novo.* Bankruptcy Rule 8013. We in turn review the bankruptcy court's findings of fact for clear error and the district court's conclusions of law *de novo.* *See In re Baker & Getty Fin. Servs., Inc.,* 974 F.2d at 717. Because the district court's determination to apply the stockbroker liquidation provisions involves a mixed question of law and fact, "we must break it down into its constituent parts and apply the appropriate standard of review for each part." *In re Batie,* 995 F.2d 85, 88 (6th Cir.1993) (citing *In re Brown,* 951 F.2d 564, 567 (3d Cir.1991)). Therefore, we review the factual findings of the bankruptcy court for clear error, while we review *de novo* the district court's conclusions of law. *In re Batie,* 995 F.2d at 88 (citing *In re Barrett,* 964 F.2d 588, 591 (6th Cir.1992)); *In re Edward M. Johnson & Assocs., Inc.,* 845 F.2d 1395, 1401 (6th Cir.1988). We will not disturb the bankruptcy court's findings of fact unless there is the "most cogent evidence of mistake of justice." *In re Johnson,*

845 F.2d at 1401 (quoting *Slodov v. United States,* 552 F.2d 159, 162 (6th Cir.1977), *rev'd on other grounds,* 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)).

## III. ANALYSIS

### A.

■ With this standard in mind, we turn to the first issue before the court: whether the bankruptcy court appropriately determined that the debtors were stockbrokers under 11 U.S.C. § 101(53A) and, therefore, subject to the stockbroker liquidation provisions of 11 U.S.C. §§ 741–752.[7] We look to 11 U.S.C. § 101(53A) for the definition of stockbroker.[8] That section reads:

(53A) "stockbroker" means person—

(A) with respect to which there is a customer, as defined in section 741(2) of this title; and

(B) that is engaged in the business of effecting transactions in securities—

(i) for the account of others; or

(ii) with members of the general public, from or for such person's own account.

From this definition, two criteria exist for a debtor to be classified as a stockbroker: (1) the debtor must have customers, and (2) the debtor must be engaged in the business of effecting transactions in securities. If B & G falls short of either requirement, then the assets of the estate must be distributed in a general liquidation pursuant to 11 U.S.C. § 726. *In re Berry,* 22 B.R. 950 (Bankr. N.D.Ohio 1982).

■ Addressing the customer element, WesBanco contends that the debtors in the instant case did not have "customers." The parties agree that Section 741(2)(B)(ii) contains the applicable definition of customer.

---

7. The distribution of the assets of the debtor's estate in a stockbroker liquidation differ markedly from that of a typical Chapter 7 liquidation. Under a Chapter 7 liquidation, the general unsecured creditors receive a pro rata share of the debtor's assets after payment of priority claims. Whereas, under a stockbroker liquidation, a separate fund of "customer property" under section 741(4) is designated for the benefit of a separate class of "customer creditors," and the remainder

is distributed to unsecured creditors, such as WesBanco. *In re ESM Gov't Sec., Inc.,* 812 F.2d 1374, 1375 (11th Cir.1987).

8. Prior to October 24, 1994, the stockbroker definition appeared in 11 U.S.C. § 101(54). Thus, all of the opinions published before October 24, 1994, refer to paragraph 54 rather than its redesignated number, 53A.

It defines a customer as, *inter alia,* an "entity that has a claim against a person arising out of a deposit of cash, a security, or other property with such person for the purpose of purchasing or selling a security." 11 U.S.C. § 741(2)(B)(ii). Likewise, the parties agree that Customer Creditors have a "claim" against B & G. *See* 11 U.S.C. § 101(5) (defining a "claim" as a "right to payment, whether or not such right is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured").

WesBanco argues that the language of the customer definition—"for the purpose of purchasing or selling a security"—requires that a *licensed* broker-dealer *purchase* stock for investors. According to WesBanco, B & G had no customers because it neither purchased securities for the accounts of Customer Creditors nor was it a licensed broker-dealer. However, the language of section 741(2)(B)(ii) does not include these criteria, and the legislative history suggests that a customer includes "anybody that interacts with the debtor in a capacity that concerns security transactions." *See* H.R. REP. NO. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6223–27. We agree with the district court that the definition of customer turns on the purpose of the creditor rather than the status or intent of the debtor. An investor qualifies as a customer when the investor deposits money or securities with the debtor with the expectation that the debtor purchase stock or trade securities. *Wider v. Wootton,* 907 F.2d 570, 573 (5th Cir.1990).[9] "[I]t is the act of entrusting the cash to the debtor for the purpose of effecting securities transactions that triggers the customer status provisions." *In re ESM Gov't Sec., Inc.,* 812 F.2d 1374 (11th Cir. 1987). Whether the debtor plans to purchase securities with the funds or defraud investors is irrelevant. In the instant case, Customer Creditors made checks payable to Baker & Getty that included descriptions of the type and amount of stock to be purchased. In addition, confirmation slips corroborate the check amounts and the anticipated stock purchases. Clearly, Customer Creditors deposited funds with B & G for the purpose of purchasing securities. We conclude, therefore, that the bankruptcy court appropriately determined that Customer Creditors were customers under 11 U.S.C. § 741(2).

Turning to the second prong of the definition, B & G must have "engaged in the business of effecting transactions in securities" in order to qualify as a "stockbroker." 11 U.S.C. § 101(53A). When determining whether B & G's activities amounted to a business of effecting securities transactions, we begin with the language of the statute. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). A basic principle which must guide our interpretation of the statute is that we give the words of the statute their "plain" meaning. *Massachusetts Fin. Servs. Inc. v. Securities Investor Protection Corp.,* 545 F.2d 754, 756 (1st Cir.1976) (quoting *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977)). The operative term, in this case, is "effecting," which Webster's defines as "something brought about by an agent or cause," or "the capacity to achieve the desired result." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 418 (1984). "Effecting" is also defined as "to cause to happen, to bring about." A DICTIONARY OF MODERN LEGAL USAGE 306 (1995). Using these definitions of "effecting," along with a common sense application of the ordinary meaning of the term, our task is to determine whether B & G's activities can be characterized as causing securities transactions.

9. In *Wider v. Wootton,* the debtor, Ronald Cohen operated a "Ponzi" scheme. The Fifth Circuit held that the investors were not "customers" because clients paid for the securities only after the securities were purchased and the clients had received stock certificates and confirmation slips. According to the court, "Cohen's clients did not provide Cohen a reservoir of cash from which to purchase securities." *Wider,* 907 F.2d at 573.

Therefore, the logical corollary is that, had the debtors provided a reservoir of cash from which the debtor might have purchased securities, the investors would have been customers. *Id.* at 572 ("Subsection (2)(B)(ii) allows customer status when the purchaser deposits cash with the debtor so that the debtor might purchase securities.").

■ WesBanco contends that the district court erred when it concluded that B & G's activities could be characterized as "effecting" securities transactions. WesBanco asserts that B & G's activities did not "effect" securities transactions because: (1) B & G was not a licensed broker-dealer and, accordingly, could not execute trades; (2) Mutual Services, not B & G, conducted trades for investors and, therefore, acted as the "stockbroker;" and (3) B & G did not purchase stock with the money deposited by Customer Creditors. We will address each of WesBanco's arguments in the order presented herein.

WesBanco first contends that the bankruptcy court erred when it attributed the securities transactions conducted by B & G stockbrokers, simultaneously acting as registered representatives of Mutual Services, to B & G. According to WesBanco, Mutual Services, a licensed broker-dealer, actually "effected" the transactions for B & G investors. WesBanco suggests that licensing creates a bright-line test for determining whether one "effects" a transaction. Section 101(53A), however, does not require that one be a licensed broker-dealer before becoming a stockbroker, and nothing in the legislative history suggests that the legislature intended that licensed broker-dealers alone qualify for stockbroker status. *See* H.R. REP. No. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6223–27. The only courts that have addressed this issue have concluded that one can be a stockbroker, regardless of whether the person is licensed. *See In re McMillan Rapp & Co.*, 38 F.Supp. 40, 41 (E.D.Pa.), *aff'd*, 123 F.2d 428 (3d Cir.1941) (finding the debtor to be a stockbroker, notwithstanding that neither the debtor nor any of its officers, directors, or employees was a member of any stock exchange, the debtor was listed under "Investors" and not stockbrokers under the yellow pages, and its letterhead read "Investment Securities."). Furthermore, while licensing serves the function of "protect[ing] the public from the financial insecurity and fraudulent activities of persons regularly engaged in the sale of securities," the purpose of the stockbroker liquidation provisions is to provide a clear and equitable manner of distributing the assets of the debtor's estate.

*See SEC v. Alan F. Hughes, Inc.*, 461 F.2d 974, 977 (2d Cir.1972); *Colorado v. Milne*, 690 P.2d 829, 835 (Colo.1984); *Oregon v. Crooks*, 84 Or.App. 440, 734 P.2d 374, 376 (1987). Because the purposes of the statutes reveal no justification for equating licensing with effecting transactions in securities, we will not impose such a requirement.

We also conclude that WesBanco's interpretation is inconsistent with the "plain meaning" of the statute. To illustrate our point, we offer the following hypothetical. A person contacts a dealership for the purpose of purchasing a Ford truck. The salesperson represents to the purchaser that he is capable of placing an order for the truck. Unbeknownst to the purchaser, the dealership is not a licensed Ford franchisee and, therefore, is incapable of completing the transaction. Instead, the salesperson, also working for a licensed franchisee, passes the purchaser's order to the licensed franchisee that executes the purchase. In this hypothetical, applying the ordinary meaning of "effects," we would say that the unlicensed dealership effects the transaction because it is an essential link in the chain of distribution. This hypothetical is not unlike the instant case. In a typical transaction, investors entered B & G's offices and directed its stockbrokers to buy or sell securities. B & G stockbrokers, also working for Mutual Services, then placed orders with Mutual Services, which in turn cleared the trades through Mesirow. Mutual Services then sent confirmation slips to the investors and the B & G stockbrokers. Similar to the unlicensed dealership in the hypothetical, B & G served as a conduit for purchases. Both B & G and the unlicensed dealership also facilitated transactions at a key point in the chain of distribution. We conclude, therefore, that WesBanco's argument that Mutual Services, but not B & G, "effected transactions in securities" is without merit.

■ WesBanco further contends that, even if the orders placed by Mutual Services can be attributed to B & G, B & G cannot properly be characterized as a stockbroker with respect to Customer Creditors because B & G did not purchase securities with the money deposited by Customer Creditors. Rather, Cordek misled Customer Creditors

into believing that their money would be spent on particular securities when, in fact, Cordek used Customer Creditors' money for his own benefit.[10] In our view, however, WesBanco's argument is contrary to the National Bankruptcy Review Act's definition of stockbroker. Section 101(53A) defines a stockbroker, not on a customer-by-customer basis, but as one "engaged in the business...." In other words, we look not to a single maverick transaction when determining whether a person is a stockbroker but, instead, to the underlying business at issue. *See Massachusetts Fin. Servs., Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D.Mass.), *aff'd*, 545 F.2d 754 (1st Cir.1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). In this case, the record reflects that, except for Cordek's dealings with Customer Creditors, B & G conducted legitimate business with *all* its customers. B & G, having achieved "stockbroker" status by virtue of its lawful business, has such status as to Customer Creditors as well. Moreover, if we were to conclude otherwise, we would provide less protection for customers who lost their money due to fraud than for those who lost their money as a result of honest mismanagement. We see no justification for such a rule.[11]

The facts in the record indicate that B & G effected securities transactions, albeit with the aid of Mutual Services. In particular, B & G enticed customers to invest their money through B & G. Investors, lured in by B & G's corporate offices and advertisements representing B & G as a licensed broker-dealer, placed money in the hands of B & G stockbrokers for the purpose of purchasing stock. B & G stockbrokers told investors that B & G was a full-service brokerage firm, capable of conducting securities transactions in-house. B & G stockbrokers, who were also registered representatives of Mutual Services, placed orders for trades through Mutual Services. All the while, B & G had taken steps to substitute itself in the position of Mutual Services by applying for licensing as a broker-dealer with the Securities and Exchange Commission. Because B & G's stockbrokers were registered representatives of Mutual Services, they could use Mutual Services to execute trades, yet maintain the strong client base should B & G become a licensed broker-dealer. First, B & G was responsible for soliciting investors, without which there would have been no securities transactions. Second, B & G's stockbrokers, as registered representatives of Mutual Services, executed transactions in securities. *See In re Berry*, 22 B.R. 950, 952 (Bankr. N.D.Ohio 1982). Finally, from the beginning, B & G operated with the intention that it replace Mutual Services upon licensing. We conclude, therefore, that B & G's activities effected transactions in securities.

Accordingly, the district court properly determined that the stockbroker liquidation provisions under 11 U.S.C. §§ 741–752 governed the distribution of the assets in the bankruptcy estate.

### B.

On cross-appeal, Customer Creditors contend that the district court erred by denying their motion to strike all references to the deposition testimony of Daniel Schwenker and Philip Cordek from the record on appeal and from WesBanco's brief. We do not find it necessary to make a determination as to

---

**10.** The district court concluded that, because Cordek commingled Customer Creditors' money with his own and later purchased securities with the commingled money in his personal account, Cordek used Customer Creditors' money to purchase securities, albeit indirectly. In our view, however, the proceedings below failed to develop a sufficient factual record as to whether Customer Creditors' money can be traced to the purchased securities. Accordingly, we will not rule on this theory.

**11.** Our result is driven, in part, by policy implications. The stockbroker liquidation provisions of the National Bankruptcy Review Act of 1987 evolved from provisions set forth in section 60(e) of the 1898 Bankruptcy Act and particular sections of the Security Investors Protection Act of 1970 ("SIPA"). *Matter of SSIW Corp.*, 7 B.R. 735, 738–39 (Bankr.S.D.N.Y.1980) (citing H.R. Rep. No. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6223–27). The legislative purpose behind these statutes was to protect and provide equality of treatment for public customers of securities brokers. *SEC v. First Sec. Co. of Chicago*, 507 F.2d 417, 420 (7th Cir.1974) (citation omitted); *SEC v. Alan F. Hughes, Inc.*, 461 F.2d at 977.

the merits of Customer Creditors' cross-appeal because David Perham's testimony alone provides adequate support to affirm the district court's order. In addition, even considering the testimony of Daniel Schwenker and Philip Cordek, we would reach the same conclusion.

## IV. CONCLUSION

Having determined that B & G was a stockbroker pursuant to 11 U.S.C. § 101(53A), we **AFFIRM** the district court's order instructing the trustee to distribute the assets of the bankruptcy estate according to the stockbroker liquidation provisions of 11 U.S.C. §§ 741–752.