[Civ. No. 26706. Second Dist., Div. Three. Oct. 16, 1963.]

IRVING I. BASS, as Trustee, etc., Plaintiff and Respondent, V. NEWTON EDWYN YOUNGBLOOD, Defendant and Appellant.

Lee Combs for Defendant and Appellant.

Craig, Weller & Laugharn, Anderson, McPharlin & Conners and Robert E. Jones for Plaintiff and Respondent.

THE COURT.—This is an action by a trustee in bankruptcy to recover the value of property transferred by the bankrupt while insolvent, without consideration[1] and with

[1]Civil Code, section 3439.04: ''Every conveyance made and every

actual intent to defraud creditors.[2] After a trial without a jury the court gave judgment for plaintiff and against the transferee for the value of the property, less certain encumbrances, plus interest from the date of the transfer. This appeal is from the judgment (which was denominated in the notice of appeal as ''Order and Judgment'').

The facts found by the trial court include the following:

On and prior to November 21, 1956, G. D. Strube was the owner of a home at Lake Arrowhead, built upon government land under a permit from the Forest Service. The value of the property at that time was $35,000, including furnishings worth $5,000. The property was encumbered by a mortgage in favor of Dr. Walter E. Lord to secure a promissory note in the principal amount of $15,000, and a second mortgage in favor of Anchor Casualty Company to secure a note on which $2,588.25 was then due. On November 21, 1956, Strube transferred this property to defendant without any consideration for the express purpose on the part of both to defraud both present and future creditors of Strube. At that time Strube was insolvent and indebted to numerous creditors, including the State of California and McLean and Michael Nisbet, whose claims remained unpaid and were provable when Strube went into bankruptcy on September 2, 1958.

The findings further recite that on November 20, 1956, Strube gave to defendant $17,253.12, which defendant deposited in his trustee account; and on November 21, 1956, defendant used this sum to pay the indebtedness of Strube to Dr. Lord. Defendant paid from his own funds $566.80 to Dr. Lord's attorney as attorney's fees and costs payable under Dr. Lord's note and mortgage.

Defendant's attack upon the sufficiency of the evidence to support these findings is very largely an argument as to the weight of the evidence, the credibility of witnesses, and the inferences to be drawn. The evidence was in conflict, but the conflicts have now been resolved by the trial judge who saw the witnesses and heard them examined and cross-examined,

obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.''

[2] Civil Code, section 3439.07: ''Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.''

and whose duty it was to determine the facts of this transaction.

In reviewing the findings, "an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion." (*Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140, 142 [134 P. 1157].)

Reading the record in the light of that rule, this court must conclude that each of the findings is adequately supported in the evidence.

We need not set out here all of the evidence, but will discuss certain aspects emphasized in defendant's brief.

Defendant is a member of the State Bar who has practiced successfully for many years. He had acted as attorney for Strube and for American Aeronautics Corporation, a corporation whose stock was wholly owned by Strube. On September 1, 1955, American Aeronautics went into bankruptcy. Both Strube and defendant testified that Strube had orally guaranteed the payment of attorney's fees, owed by the corporation; and that as of November 21, 1956, Strube owed defendant approximately $18,000 in attorney's fees, of which about $12,000 to $14,000 was the fee owed by the corporation and the balance was for fees owed by Strube individually. As of November 1956 Dr. Lord had commenced an action to foreclose his mortgage on the Arrowhead home, and Strube had no defense to the action. He attempted to sell the property, but without success. Strube and defendant testified that they then entered into an oral agreement whereby Strube would transfer the home to defendant, in consideration for which defendant would pay off the debt to Dr. Lord, estimated at $17,000, and the $18,000 obligation for attorney's fees would be discharged. There was no written agreement. Strube executed a written assignment of the property to defendant which recited it was "For valuable consideration," but the nature of the consideration was not stated in the document.

The trial court found that it was not true that Strube was indebted to defendant for attorney's fees either for services rendered to him or for services rendered to the corporation. The trial court found that defendant had received at least $11,500 for services rendered to the corporation. There was substantial evidence to support that finding, though defendant and Strube testified otherwise. Strube testified that he was sure he had paid defendant some fees in cash or by

money order, though he could not remember the amount. Such payments would be in addition to the $11,500 and which the court specifically found to have been paid. The bankruptcy schedules of American Aeronautics Corporation, which were prepared in defendant's office and under his supervision, did not list any liability to defendant for attorney's fees.

Strube's income tax return for the year 1956 did not show any attorney's fees paid. Neither did it show the gain which he would have made if he had actually sold the house for $35,000. Defendant conceded that he did not record the $18,000 in his books of account as fees received for the year 1956.

Neither defendant nor Strube was able to produce any bill, letter, receipt or bookkeeping record pertaining to any attorney's fees charged or paid with respect to defendant's representation of Strube and his corporation. Defendant testified that some such records had existed, but had been destroyed as worthless. It is noted that the first legal action attacking the November 21, 1956, transaction as fraudulent was filed less than four months later, on March 8, 1957. Defendant's failure to preserve the records relating to the fees which were the alleged consideration for that transaction surely supports an inference against him. (Code Civ. Proc., § 1963, subd. 5.)

The fact that substantial fees had been paid, together with the absence of documentary evidence that other fees had been charged, in the light of the strange circumstances here, constituted substantial evidence that Strube was not indebted to defendant on November 21, 1956.

Strube was a man who preferred to keep his cash in his pocket and in a safe deposit box. His recollection of his financial transactions was uncertain. He testified he considered it unsafe to keep his money in a bank because of the danger of attachments. Defendant also, by his own testimony, made a practice of accumulating thousands of dollars in cash which he kept in the office or in a safe deposit box.

The evidence indicates that as of November 21, 1956, Strube was insolvent within the meaning of Civil Code, section 3439.02, and that he had reason to fear that his creditors were about to strip him of all of his visible and nonexempt assets.

Defendant's brief asserts: "No affirmative evidence exists in this case to prove that Strube furnished any portion of the $17,253.12 paid by defendant on November 21, 1956, to Ellis D. Reiter and Dr. Walter E. Lord, unless we dignify as a

reasonable inference what is only suspicion. All the direct evidence is to the contrary." In view of the emphasis placed upon this point by defendant, the evidence will be stated.

At the beginning of the trial Strube and defendant were called as plaintiff's witnesses, and both testified positively that Strube had furnished none of the money which went to Dr. Lord. Strube was confronted with a salary check in the amount of $9,846 dated November 20, 1956, payable to him from his then employer, which was drawn upon the Sun Valley National Bank of Sun Valley, California, and cashed there the same day. Strube said he could not recall what he had done with this money.

Defendant testified that he paid Dr. Lord by means of a check dated November 21, 1956, payable to the order of Dr. Lord, drawn upon an account maintained by defendant in the name of "N. E. Youngblood, Trustee" in the Olympic and Beverly Drive Branch of the Security-First National Bank. Defendant identified the canceled check and also the bank ledger sheet for this account, which also showed a deposit of $17,253.12 made on November 21, 1956. Defendant was asked the source of the deposit. His answer was, "Prior attorney's fees from various clients, an accumulation thereof." He said none of the money came from his general account, but he couldn't be any more specific as to the source. He said he had gone to the bank and had asked to see the deposit slip in order to find out the form in which the deposit had been made but he had been told by the manager that deposit slips were kept only a year and a half.

Plaintiff then called the custodian of the records of the Olympic and Beverly Drive Branch of the Security-First National Bank. He said deposit slips are normally kept ten years. He produced a deposit slip showing that the November 21, 1956, deposit of $17,253.12 was composed of two cashier's checks, one in the amount of $8,300 and the other in the amount of $8,953.12, both drawn upon the Sun Valley National Bank of Sun Valley, California.

The custodian of the records of the Sun Valley bank was then called. He testified that the bank had preserved the cashier's checks issued on November 21, 1956, but that two of them, numbers 13625 and 13627, were missing from the file. He did find in the file number 13624 which had been made out for $83.00 and then voided. This void check showed the remitter to be Gordon D. Strube and the payee N. E. Youngblood. The bank had attempted to locate the applications for

those missing cashier's checks, but had discovered that the drawer which should have contained applications for the period of March 1955 through December 1956 was empty, although applications for an earlier period were found. The witness was able to find the "batch tape" for November 20, 1956, which is a summary of the day's transactions made up by a bookkeeping machine. This tape showed that the bank had received $17,253.12 which went to purchase two cashier's checks that day.

The court then recalled defendant to the stand and asked him if he had any recollection of having deposited the two cashier's checks, one for $8,300 and one for $8,953.12, in his trustee account on November 21, 1956. Defendant replied, "I have no memory of it at the moment, your Honor." Defendant reiterated his statement that he had furnished the money to pay off Dr. Lord. The examination by the court continued: "Q. I am not asking you that. Do you have any recollection of giving $17,253.12 in cash to Mr. Strube for the purpose of purchasing cashier's checks for you? A. I have no present memory of that, no, your Honor. Q. Can you indicate to the Court any reason or object or purpose for your handing Mr. Strube or any other person $17,253.12 in cash for the purpose of going to the Sun Valley Bank and purchasing cashier's checks? A. The only purpose I would have would be as a matter of convenience. Q. Why would it be a matter of convenience for you to deposit cashier's checks rather than the currency? A. I can't tell you, your Honor."

Plaintiff then called another bank employee who was able to testify, from the symbols on the batch tape, that the Sun Valley bank received cash in the amount of $2,407.62 and two checks drawn on the Sun Valley bank in the amounts of $9,846 and $5,000, for which it issued two cashier's checks in the amounts of $8,300 and $8,953.12, and collected a service charge of 50 cents for the two checks.

At the conclusion of the day's session, defendant's counsel asked for a continuance of one week to allow him to investigate and meet what had been disclosed in the bank records. The court gave him eight days.

When the trial resumed after the recess defendant called Laveania Coons, who had been his secretary for nineteen years. Mrs. Coons testified that on November 20, 1956, defendant had instructed her to buy a cashier's check for $17,253.12 payable to Dr. Lord. She took $17,300 in hundred dollar bills from a metal box in the office and placed these

bills in an envelope to take to the bank. The office was approximately one block from the Beverly and Olympic branch bank, where defendant kept his account. Due to the pressure of work she was unable to go to the bank. About noon Norman Semler, a client, came in to see defendant, who was out of the office. Mrs. Coons said she asked Semler to buy the cashier's check for her. Mrs. Coons testified she gave him the envelope containing the currency together with a piece of paper on which she had written some information. She did not obtain a receipt. That afternoon she received a telephone call from Strube saying that he had the check, so she told Strube to mail it to her. When the $8,300 and $8,953.12 checks arrived the next day she deposited them in the trustee account and prepared the $17,253.12 check on the trustee account which was delivered to Dr. Lord. She does not know what happened to the change. She testified that she had had no occasion to discuss these events with defendant or his counsel until the recess in the trial.

Norman Semler was then called by defendant. Semler testified that on November 20, 1956, Mrs. Coons had given him an envelope containing money and he agreed to purchase a cashier's check for her. The instructions were written on the envelope. He was to obtain one cashier's check. The envelope was sealed and he never counted the contents. He did not hear any loose coins rattling inside. He then drove in his automobile to the office of Consolidated Aeronautics, where Strube was employed as president and general manager. One of Semler's purposes in going there was to collect some money owed by Strube or his company. Strube's secretary told Semler that Strube was at the Sun Valley National Bank. Semler then went to the Sun Valley bank and met Strube. In the course of a conversation Semler told Strube he was to get a cashier's check for defendant. Strube offered to take care of it, so Semler turned the envelope over to Strube and left. He did not ask for or obtain a receipt.

Strube was then recalled to give his version. Strube testified that on November 20, 1956, he went to the Sun Valley bank to cash two checks of Consolidated Aeronautics that had been made payable to him, one for $9,846 and one for $5,000. When Semler came into the bank and stated that he was about to buy a cashier's check for defendant, Strube offered to handle it. Strube then took some of Youngblood's cash from the envelope in exchange for the two Consolidated checks and applied the Consolidated checks toward the pur-

chase of two cashier's checks payable to Youngblood. Strube said he told the teller to split the amount so that neither check would be over $10,000.[3] Strube testified that the envelope which he received from Semler contained exactly $17,253.12. After purchasing the two cashier's checks he telephoned Mrs. Coons and she instructed him to mail them to her, which he did.

The trial judge listened to this story with the utmost courtesy and forbearance. At the end of the case, following argument by counsel, the court summed up the evidence as he saw it. The testimony offered following the eight-day recess he categorized as "positively shocking and disgraceful and completely unbelievable." Rejecting the absurd story of the envelope of currency which passed from hand to hand, the court was left with the testimony of defendant's own witnesses that on November 20, 1956, Strube was in possession of substantial funds not supplied by defendant, and on that day Strube purchased and sent to defendant two cashier's checks totaling the exact amount to be paid to Dr. Lord.

Defendant contended in the trial court, and contends here, that the validity of the transfer was res judicata, or that the action was barred by collateral estoppel. Specifically, defendant relies upon the orders or judgments resulting from three proceedings: (1) The proceedings before the referee in bankruptcy passing upon the trustee's objections to Strube's discharge. (2) The action of *Wade* v. *Strube and Youngblood,* brought in the Superior Court of San Bernardino County by a judgment creditor of Strube to set aside the transfer as void, which action resulted in a judgment for defendants. (3) The action of *Anchor Casualty Company* v. *Strube* in the Superior Court of Los Angeles County in which Anchor attached the Arrowhead property and defendant Youngblood filed a third party claim which was sustained by the court.

■ In the bankruptcy court the trustee objected to Strube's discharge on several grounds, one of which was that he had transferred the Arrowhead property in fraud of creditors. The referee found that the transfer occurred on Novem-

---

[3]The reason for avoiding the issuance of a check over $10,000 is not disclosed in the record. Defendant offered this explanation in his closing brief: "We live in a time when banks are required to report to the Director of Internal Revenue every unusual transaction involving a substantial sum of money, and no sensible person today, with the most honest and legitimate of purposes, would walk into a strange bank and buy a cashier's check for over $10,000.00."

ber 21, 1956, which was more than twelve months prior to the filing of Strube's petition in bankruptcy (September 2, 1958) and hence was not a ground for denying discharge under section 14, subdivision c (4) of the Bankruptcy Act (11 U.S.C.A. § 32, subd. c (4)). The referee specifically declared he was making no finding either as to the consideration for the transfer or the purpose of the bankrupt. Strube was denied a discharge on other grounds. Since it affirmatively appears that the issues which are pertinent here were not decided by the referee, that order could not be res judicata here. (*Stark* v. *Coker*, 20 Cal.2d 839, 843 [129 P.2d 390].)

[4] Plaintiff concedes that the judgment in the *Wade* case and the order sustaining the third party claim in the *Anchor Casualty* case constitute res judicata in defendant's favor against *Wade* and *Anchor Casualty*. Plaintiff is maintaining the present action under the authority of section 70, subdivision e (1), of the Bankruptcy Act (11 U.S.C.A. § 110, subd. e (1)) which provides:

"A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."

The trustee, as plaintiff here, has shown that the State of California and McLean and Michael Nisbet were creditors of Strube at the time of the transfer and had claims provable in bankruptcy. Neither the state nor the Nisbets were parties or in privity with any party to the *Wade* case or the *Anchor Casualty* case. Thus the judgments in those cases cannot be asserted against either of them. (See *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.*, 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439].) Where the trustee is proceeding under section 70, subdivision (e), in the right of one creditor, he is not barred by a defense of res judicata which would be available against one of the other creditors. (*Coleman* v. *Alcock* (5th Cir.) 272 F.2d 618; *Star Brewing Co.* v. *Flynn*, 261 Mass. 426 [158 N.E. 891]; cf. *Buffum* v. *Peter Barceloux Co.*, 289 U.S. 227, 233 [53 S.Ct. 539, 77 L.Ed 1140, 1145]; 4 Collier on Bankruptcy, § 70.90 [2].)

Defendant points out that under settled bankruptcy law if plaintiff prevails here the amount recovered by plaintiff will become a part of the bankrupt estate and Anchor

Casualty, as one of the creditors of that estate, will share in the proceeds notwithstanding the judgment by which defendant defeated Anchor's earlier attack on this conveyance. (*In re Moore* (4th Cir.) 11 F.2d 62.) Defendant urges the court to indulge the not unreasonable assumption that Anchor, as the largest creditor, is financing this litigation in the expectation that it will receive the greater part of the proceeds. Defendant argues that the plaintiff is really representing Anchor Casualty more than he is representing the two creditors who give him standing to sue. This argument is merely an attack on the Bankruptcy Act which gives the trustee, under some circumstances, the power to set aside, for the benefit of all creditors, a transaction which, under state law, only one of them could have attacked. This being the law of bankruptcy, there is no way in which the state court can close its doors to the trustee without also depriving the State of California and the Nisbets of their undeniable rights as creditors.

 Defendant contends that there is no factual basis for the award of interest from November 21, 1956, to the date of judgment. He argues that the Arrowhead house was not an income producing asset, but a financial burden upon the owner, and hence if the value of the property is restored, the estate is more than made whole. This overlooks the fact that the detriment to the transferor is not the exclusive measure of damages. Since the transfer is deemed void as well as fraudulent, the transferee may be treated as a constructive trustee and required to account for what he has received. (*Buffum* v. *Peter Barceloux Co., supra; Pedro* v. *Soares,* 18 Cal.App.2d 600, 604 [64 P.2d 776]; *Ohio Electric Car Co.* v. *Duffet,* 48 Cal.App. 674, 678 [192 P. 298].) Here defendant had the use of property with a stipulated value of $35,000 commencing on November 21, 1956. The Civil Code, section 3288, provides that in every case of fraud, interest may be given in the discretion of the jury (or, in this case, the court). We cannot say that the court abused its discretion in this respect.

Defendant makes the wholly untenable assertion that "plaintiff affirmatively established that the value of the 'residence' on November 21, 1956 was only $20,000.00." The complaint alleged and the answer admitted that the property had a value of $35,000. The pretrial stipulation stated that the value was "approximately $35,000.00." At the trial defendant's counsel asked Strube if he had an opinion as to

the value of the property. Plaintiff objected upon the ground that the value was not an issue under the pleadings and the pretrial order. The court allowed the witness to answer for the purpose of showing his knowledge of the value, which would be material on the issue of fraudulent intent. Strube then testified that in his opinion the house was worth $20,000 and the furnishings $5,000. In the trial court's findings and judgment the house was valued at $30,000 and the furniture at $5,000. The court held the furniture to be exempt under Code of Civil Procedure, sections 690 and 690.2, and gave defendant the benefit of the $5,000 valuation supplied by the Strube testimony.

Equally unmeritorious is defendant's contention that certain documents were hearsay and should not have been received in evidence against defendant. A financial statement prepared by Strube dated January 20, 1956, was used by defendant in connection with certain negotiations with Anchor Casualty Company. It shows no indebtedness of Strube to defendant. The document was received in evidence to impeach the testimony of defendant that Strube was indebted to him in a substantial amount at that time. The trial court considered it significant that defendant accepted and used this document without protest at the time. (Code Civ. Proc., § 1870, subd. 3.)

The bankruptcy schedules of American Aeronautics Corporation, which were prepared under defendant's supervision and signed by Strube, failed to show that that corporation was indebted to defendant. This document was also received to impeach Strube's testimony and defendant's testimony that the corporation was indebted to him in a substantial amount.

A packet of cashier's checks issued by the Sun Valley bank in November 1956 was received to illustrate the bank employee's testimony that all checks were found in their proper place except the two in the amounts of $8,300 and $8,953.12. The packet also demonstrates that the check immediately preceding those in the sequence was made up for Strube as remitter and defendant as payee in the amount of $83.00 (which was subject to the inference that it was a clerical error) and then voided.

Finally, defendant asserts that "the whole record" supports the defense of laches. The record shows that plaintiff qualified as trustee of the bankrupt's estate on September 30, 1958, and the action was filed August 25, 1960. There is

nothing in the record to compel a finding that this delay was unreasonable or that defendant was prejudiced thereby. The trial court's findings against defendant on these fact issues must be sustained.

The judgment is affirmed.

A petition for a rehearing was denied October 31, 1963, and appellant's petition for a hearing by the Supreme Court was denied December 11, 1963.