**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: REED E. SLATKIN,

*Debtor.*

_____

GLENN JOHNSON; BARBARA
JOHNSON; SANTA BARBARA CAPITAL
MANAGEMENT, a limited liability
company,

*Appellants,*

v.

R. TODD NEILSON, Trustee of the
Estate of Reed Slatkin,

*Appellee.*

No. 06-56334

D.C. No.
CV-06-00512-
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
April 11, 2008—Pasadena, California

Filed May 6, 2008

Before: Robert R. Beezer, Thomas G. Nelson, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Thomas G. Nelson

## COUNSEL

Richard M. Moneymaker, Los Angeles, California, for the appellants.

John P. Reitman and Peter J. Mastan, Gumport Reitman, Los Angeles, California, for the appellee.

## OPINION

T.G. NELSON, Circuit Judge:

The bankruptcy court granted summary judgment in favor of the Trustee of the bankruptcy estate of Reed E. Slatkin, avoiding under 11 U.S.C. § 548(a) and California Civil Code § 3439.04(a) certain transfers made by Slatkin during his operation of a Ponzi scheme.[1] The district court affirmed the grant of summary judgment. We have jurisdiction over this appeal under 28 U.S.C. § 1291, and we affirm.

### FACTS AND PROCEDURAL HISTORY

In May 2001, Slatkin filed for Chapter 11 bankruptcy protection. Shortly thereafter, he was charged in a federal criminal case with mail fraud, wire fraud, money laundering, and

---

[1] "[A] Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 759 n.1 (9th Cir. 2000).

conspiracy to obstruct justice in connection with his operation of a Ponzi scheme. He pled guilty to the criminal charges pursuant to a plea agreement and currently is serving a fourteen-year prison sentence. In his plea agreement, Slatkin admitted that from 1986 to May 2001, he operated a Ponzi scheme in which he paid investors purported profits primarily using funds raised from other investors. Slatkin's Ponzi scheme involved over $593 million and approximately 800 investors, and resulted in losses exceeding $240 million.

In August 2002, the Trustee initiated the first of hundreds of adversary proceedings against Slatkin's investors. In these adversary proceedings, the Trustee sought avoidance and recovery, under 11 U.S.C. § 548(a)(1) and California Civil Code § 3439.04(a), of actual fraudulent transfers made by Slatkin to investors. Specifically, the Trustee sought to avoid as fraudulent any transfer made by Slatkin to an investor to the extent that such transfer exceeded the amount the investor had given Slatkin, i.e., the amount of the investor's purported profit on their investment.

The present case involves the adversary proceeding filed by the Trustee against investors Glenn Johnson, Barbara Johnson, and Santa Barbara Capital Management (collectively, the "Johnsons"). During the period of time that Slatkin was operating the Ponzi scheme, he transferred millions of dollars in purported profits to the Johnsons. The Trustee seeks to avoid and recover these purported profits.

The bankruptcy court granted the Trustee partial summary judgment, finding that Slatkin's guilty plea and plea agreement conclusively established that Slatkin operated a Ponzi scheme from 1986 to May 2001 with the actual intent to defraud his creditors. Slatkin's actual intent is important because, to be avoidable and recoverable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and California Civil Code § 3439.04(a)(1), the transfer must have been made with

the actual intent to hinder, delay, or defraud creditors. *See* 11 U.S.C. § 548(a)(1)(A); Cal. Civ. Code § 3439.04(a)(1).

The bankruptcy court then granted the Trustee summary judgment on the remaining issues, finding (1) that the Trustee had the right to avoid and recover the transfers to the Johnsons, and (2) that the Trustee was entitled to prejudgment interest.

The district court affirmed the bankruptcy court's grants of summary judgment. The Johnsons timely appeal to this court.

## STANDARD OF REVIEW

We review de novo a district court's decision on appeal from a bankruptcy court. *Ditto v. McCurdy*, 510 F.3d 1070, 1075 (9th Cir. 2007). We review the bankruptcy court's grant of summary judgment de novo. *Id.* We may affirm the grant of summary judgment on any basis supported by the record. *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007).

On a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## ANALYSIS

A. *The bankruptcy court did not abuse its discretion in denying the Johnsons' motion for a continuance to conduct further discovery.*

The Johnsons argue that the bankruptcy court abused its discretion in denying them additional discovery prior to granting summary judgment on the issue of Slatkin's intent. In particular, they argue that they were not allowed to depose Slatkin or review the transcript of Slatkin's testimony in a proceeding before the Trustee[2] prior to the bankruptcy court's grant of summary judgment on the issue of Slatkin's intent.

**[1]** We review the bankruptcy court's refusal to grant a continuance to permit additional discovery for an abuse of discretion. *See Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475-76 (9th Cir. 1985). "[W]e will only find an abuse of discretion if the movant diligently pursued its previous discovery opportunities, and can demonstrate that allowing additional discovery would have precluded summary judgment." *See Bank of Am., NT & SA v. PENGWIN*, 175 F.3d 1109, 1118 (9th Cir. 1999).

**[2]** The Johnsons have now had the opportunity to conduct the requested discovery by deposing Slatkin and reviewing the transcript of his previous testimony in the proceeding before the Trustee. The Johnsons fail to point to anything that contradicts the plea agreement or the bankruptcy court's finding, based on the plea agreement, that Slatkin operated a Ponzi scheme over a fifteen year period with the actual intent to defraud. The Johnsons also fail to demonstrate that additional discovery would have otherwise precluded the grant of summary judgment on the issue of Slatkin's intent. We therefore hold that the bankruptcy court did not abuse its discretion

---

[2]The Johnsons were not a party to the proceeding before the Trustee.

in denying the Johnsons further discovery prior to granting partial summary judgment. *See id.*

B.   *The Johnsons' right to a jury trial was not violated by the grant of summary judgment.*

The Johnsons argue that the grant of summary judgment violates their right to a trial by jury guaranteed by the Seventh Amendment to the United States Constitution. We reject this claim as without merit. As the Supreme Court held, over one hundred years ago, a summary judgment proceeding does not deprive the losing party of its Seventh Amendment right to a jury trial. *See Fid. & Deposit Co. of Md. v. United States*, 187 U.S. 315, 319-21 (1902); *see also Anderson*, 477 U.S. at 251-52 (holding that there is no right to a jury trial where the evidence is "so one-sided that one party must prevail as a matter of law").

C.   *The bankruptcy court properly determined that Slatkin acted with the actual intent to "hinder, delay, or defraud" his creditors.*

The bankruptcy court granted summary judgment on the issue of Slatkin's actual intent based solely on Slatkin's guilty plea and plea agreement. The Johnsons argue that, in doing so, the bankruptcy court erred. Specifically, the Johnsons argue (1) that the plea agreement should not have been admitted, and (2) that the plea agreement should not be given preclusive effect as to Slatkin's intent.

We review the bankruptcy court's evidentiary rulings for an abuse of discretion. *Latman v. Burdette*, 366 F.3d 774, 786 (9th Cir. 2004). To reverse on the basis of an erroneous evidentiary ruling, we must conclude not only that the bankruptcy court abused its discretion, but also that the error was prejudicial. *Id.*

1. *The plea agreement is admissible to demonstrate that Slatkin operated a Ponzi scheme with the intent to defraud.*

**[3]** The plea agreement is being offered to show the truth of the information contained therein—that Slatkin ran a Ponzi scheme and, in doing so, had the actual intent to defraud his creditors. The plea agreement is therefore hearsay. *See* Fed. R. Evid. 801(c). To be considered on a motion for summary judgment, the plea agreement must accordingly fall within one of the exceptions to the hearsay rule. *See* Fed. R. Civ. P. 56(e)(1) (requiring that only admissible evidence be considered for purposes of summary judgment); Fed. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or by other [applicable] rules . . . .").

The bankruptcy court did not make clear which hearsay exception it relied upon in finding the plea agreement to be admissible. We can, however, affirm the bankruptcy court's evidentiary ruling on any ground supported by the record, even if it differs from the reasoning of the bankruptcy court. *See Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003) (per curiam).

We hold that the plea agreement is admissible under Federal Rule of Evidence 807, and that the bankruptcy court did not, therefore, abuse its discretion when it considered the plea agreement in granting summary judgment.

Under Rule 807,

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent

can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807.

**[4]** Slatkin's plea agreement meets the requirements for admission under this rule. First, the plea agreement is offered as evidence of a material fact—Slatkin's operation of a Ponzi scheme over a fifteen-year period and his actual fraudulent intent in doing so.

**[5]** Second, Slatkin's admissions in the plea agreement that he operated a Ponzi scheme, and that he did so with the actual intent to defraud, are more probative on these issues than any other evidence the Trustee could procure. In fact, it is precisely because such direct proof of fraudulent intent is rarely available that courts allow a finding of fraudulent intent based on circumstantial evidence. *See Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983) ("A court may make a finding of fraudulent intent under section 548(a)(1) on the basis of circumstantial evidence; direct proof of the transferor's fraudulent intent will rarely be available."); *Am. Express Travel Related Servs. Co. v. Golchin (In re Golchin)*, 175 B.R. 366, 367-68 (Bankr. S.D. Cal. 1993) ("Rarely will a person who is guilty of fraudulent conduct admit his guilt. Thus, direct proof of fraudulent intent is rarely available.") (internal quotations and alterations omitted).

**[6]** Third, admission of the plea agreement to prove Slatkin's actual fraudulent intent and operation of the Ponzi scheme furthers the general purposes of the Rules of Evidence and "the interests of justice will best be served by admission of the [plea agreement] into evidence." Fed. R. Evid. 807.

**[7]** Finally, Slatkin's plea agreement has equivalent circumstantial guarantees of trustworthiness. His guilty plea, based

on the plea agreement, (1) was made under oath with the advice of counsel, (2) subjected Slatkin to severe criminal penalties, (3) was made after Slatkin was advised of his constitutional rights, and (4) was accepted by the court in the criminal matter only after the court determined that Slatkin's plea was knowing and voluntary.

The Johnsons take issue only with the "equivalent circumstantial guarantees of trustworthiness" requirement of Rule 807. The Johnsons argue that the plea agreement is unreliable and untrustworthy because (1) Slatkin is a perpetrator of a fraud to which he admits and he is thus not "reliable" or "credible"; (2) Slatkin made statements in the plea agreement solely for the purpose of demonstrating his extraordinary cooperation, resulting in his sentence being reduced from 105 years to 14 years; and (3) the Trustee requested certain things be included in the plea agreement solely to benefit the Trustee's litigation position. We reject these arguments and hold that the plea agreement was admissible under Rule 807.

First, the criminal consequences to Slatkin of making the admissions contained in the plea agreement provide a sufficient circumstantial guarantee of trustworthiness to overcome any concern regarding Slatkin's unreliability or lack of credibility. *Cf.* Fed. R. Evid. 804(b)(3) (deeming admissible statements made by an *unavailable* declarant that tend to subject the declarant to criminal liability such that a reasonable person in the declarant's position would not have made the statements unless believing them to be true).[3]

Second, the plea agreement did not, as the Johnsons argue, reduce Slatkin's sentence from 105 years to 14 years. *If* Slatkin had been subjected to the *maximum statutory sentence* on each of his counts of conviction, *and if* the sentences on each

---

[3]We decline the Trustee's invitation to find Slatkin unavailable as a matter of law and therefore do not address the Trustee's argument that Slatkin's plea agreement is admissible under Fed. R. Evid. 804(b)(3).

of the counts of conviction had been imposed to run *consecutively*, the total length of his combined sentence would have been 105 years.[4] There is, however, no indication that the district court would have sentenced Slatkin to the statutory maximum on each count of conviction or imposed consecutive sentences if Slatkin had not entered into the plea agreement. Further, the district court was not bound by the plea agreement. Thus, although Slatkin obviously benefitted from the plea agreement through the government's agreement to make certain sentencing recommendations, the plea agreement did not, as the Johnsons argue, result in a ninety-one year reduction in Slatkin's sentence.

Finally, the fact that the Trustee may have requested that certain information be included in the plea agreement does not, under the circumstances, render the plea agreement unreliable. This is particularly true here because Slatkin has consistently maintained, in both written testimony and during oral testimony, that the factual statements in the plea agreement are true and accurate.

2.  *The plea agreement preclusively establishes Slatkin's intent to defraud in relation to transfers to investors of purported profits.*

The Johnsons argue that the plea agreement cannot be used to establish Slatkin's intent regarding the transactions Slatkin had with the Johnsons. The Johnsons further argue that evidence they submitted—Slatkin's 1999 tax return— raises an issue of fact precluding summary judgment on the issue of intent. We reject both of these arguments and hold that the

---

[4]The statutory maximum sentence for each of the five counts of mail fraud to which Slatkin pled guilty was five years; the statutory maximum for each of the three counts of wire fraud to which Slatkin pled guilty was three years; the statutory maximum for each of the six counts of money laundering to which Slatkin pled guilty was ten years; and the statutory maximum for the single count of conspiracy to obstruct justice to which Slatkin pled guilty was five years.

plea agreement preclusively establishes that Slatkin's transfers of purported profits to investors during his operation of the Ponzi scheme were made with the actual intent to defraud.

a.  *Slatkin's actual intent to defraud is established by his admissions in his plea agreement.*

Slatkin admitted in his plea agreement that from 1986 to May 2001, he (1) used the "bulk of investor funds to operate a massive 'Ponzi' scheme whereby he defrauded his investors by paying them returns largely with funds raised from other investors"; (2) "planned and executed a scheme to defraud approximately 800 investors . . . of over $593 million"; (3) did not invest the vast majority of investor funds he received during this time but instead disbursed those funds "to other investors as fraudulent returns, diverted funds for his own personal benefit, and dissipated funds on many speculative, undisclosed, and ultimately unprofitable investments"; (4) used newly invested funds from some investors to pay other investors because his investments did not generate sufficient income to meet investors' periodic requests for payments; and (5) sent false and fabricated account statements to investors.

**[8]** We previously have found the mere existence of a Ponzi scheme sufficient to establish the actual intent to hinder, delay, or defraud creditors under 11 U.S.C. § 548(a) and California Civil Code § 3439.04(a), or another state's equivalent fraudulent transfer statute. *See Barclay v. MacKenzie (In re AFI Holding, Inc.)*, No. 06-55033, ___ F.3d ___, 2008 WL 1734583, at *3 (9th Cir. April 16, 2008) (examining 11 U.S.C. § 548(a) and Cal. Civ. Code § 3439.04(a)); *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 534-35 (9th Cir. 1990) (examining 11 U.S.C. § 548(a) and Hawaii's uniform fraudulent transfer act); *see also Plotkin v. Metro Honda (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. B.A.P. 1996) (examining § 548(a) and Calif. Civ. Code § 3439.04(a)). We now hold that a debtor's admission, through guilty pleas and a plea agreement admissi-

ble under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under 11 U.S.C. § 548(a)(1)(A) and California Civil Code § 3439.04(a)(1), and precludes relitigation of that issue. *See Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997) ("[T]he criminal conviction of Ms. Rodriguez based on the debtors' operation of a Ponzi scheme conclusively establishes fraudulent intent, and precludes the defendant from relitigating this issue."); *Martino v. Edison Worldwide Captial (In re Randy)*, 189 B.R. 425, 439 (Bankr. N.D. Ill. 1995) (holding that debtor's actual intent to defraud investors was preclusively established by the jury verdict against him in a criminal proceeding); *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 648 (Bankr. W.D. Tenn. 1993) ("The debtors' intent to defraud creditors was established by the guilty pleas to the related criminal charges and preclusive effect may be given to those guilty pleas as factual findings to the extent that the debtors' intent to defraud creditors is required in this adversary proceeding.").

    b.  *The plea agreement provides a sufficient factual basis to support the bankruptcy court's finding that the conveyances to the Johnsons were fraudulent.*

**[9]** The Johnsons argue that the plea agreement does not provide a sufficient factual basis to support a determination that Slatkin's transfers to them were fraudulent. The Johnsons claim that the Trustee must demonstrate the source of each of the transfers to them and demonstrate that the source of those transfers was not "legitimate." We disagree. We hold that once the existence of a Ponzi scheme is established, payments received by investors as purported profits—i.e., funds transferred to the investor that exceed that investor's initial "investment"—are deemed to be fraudulent transfers as a matter of law.

Although this circuit has not yet addressed this issue, the Seventh Circuit has, in a well-reasoned decision authored by Judge Posner. *See Scholes*, 56 F.3d 750.

In *Scholes*, as in the present case, the debtor masterminded a Ponzi scheme. *Id.* at 752. The debtor in *Scholes* operated a Ponzi scheme for a period of approximately two years and defrauded investors of approximately $30 million. *Id.* He pled guilty to fraud in a criminal proceeding and was sentenced to a twelve-year term of imprisonment. *See id.*

A receiver was appointed to attempt to recover certain funds transferred by the debtor to investors. *Id.* One of the individuals from whom the receiver attempted to recover funds was Phillips, who was in a position similar to the Johnsons—he was "one of the investors in the Ponzi scheme who was lucky enough to make money." *Id.* at 753. The Seventh Circuit held that the payments Phillips received from the debtor representing "profits," i.e., funds transferred to Phillips by the debtor that exceeded Phillips' initial investment, were fraudulent conveyances that Phillips was not entitled to keep. *Id.* at 757-58.

**[10]** As the court explained, the source of the "profits" received by Phillips was "[a] theft by [the debtor] from other investors." *Id.* at 757.

> It is no answer that some or for that matter all of Phillips's profit may have come from "legitimate" trades made by the [debtor]. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations. Phillips was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the debtor]. It is not true as between him and either the creditors . . . or the other investors . . . . [Phillips] should not be permitted to

> benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment — the difference between what he put in at the beginning and what he had at the end.

*Id.* at 757-58; *see Cunningham v. Brown*, 265 U.S. 1, 12-13 (1924) (holding, in what has been referred to as the "original" Ponzi scheme case, that under circumstances involving multiple victims and commingled funds, tracing should not be utilized and that, instead, equity demands that all victims of the fraud be treated equally).

**[11]** In the present case, the source of any profits received by the Johnsons was a theft from the other investors. *See Scholes*, 56 F.3d at 757. Although the Johnsons argue that there is a question of fact as to whether the purported profits they received were from "legitimate" investments made by Slatkin, in truth none of the trades made by Slatkin were "legitimate" because the money used for the trades came from investors gulled by Slatkin's fraudulent representations. *See id.*

All the Johnsons are being asked to do is return the purported profits on their investment. *See id.* at 757-78. This will prevent the injustice that would result if the Johnsons were allowed to retain their purported profit at the expense of other defrauded investors. *See id.* at 757; *see also Cunningham*, 265 U.S. at 12-13.

    c.   *The 1999 tax return does not raise a genuine issue of material fact.*

The Johnsons argue that Slatkin's 1999 tax return—which lists taxable income of $27,982,808; tax liability of $7,160,676; payments made of $2,416,712; and capital gains attributed to various investors, including the Johnsons—raises a genuine issue of material fact on the issue of whether Slat-

kin operated a Ponzi scheme from 1986 through 2001. We disagree.

**[12]** As discussed above, Slatkin's guilty plea and plea agreement conclusively establish that he operated a Ponzi scheme from 1986 through 2001 with the intent to defraud his creditors; and the transfers to the Johnsons of purported profits on their investment are therefore deemed fraudulent as a matter of law.

**[13]** The mere fact that Slatkin reported income to the Internal Revenue Service and delineated capital gains for certain investors is not inconsistent with his operation of a massive Ponzi scheme. Further, that Slatkin may have invested a small percentage of the funds he received from investors, and may have received a profit from such investments, does not create a genuine issue of material fact as to the actual existence of the Ponzi scheme.

D.   *The bankruptcy court properly determined that Slatkin was not a "stockbroker" under the Bankruptcy Code.*

The Johnsons next argue that the bankruptcy court erred in granting summary judgment on the issue of whether Slatkin was a "stockbroker" under the Bankruptcy Code. The question of whether Slatkin was a "stockbroker" is significant because the Trustee is prohibited from avoiding settlement or margin payments made by "stockbrokers." *See* 11 U.S.C. § 546(e).

**[14]** To be a "stockbroker" under the Bankruptcy Code, an individual has to (1) have a "customer" as defined in 11 U.S.C. § 741, and (2) be "engaged in the business of effecting transactions in securities—(i) for the account of others; or (ii) with members of the general public, from or for such person's own account." 11 U.S.C. § 101(53A). We hold that although Slatkin had "customers," he was not "engaged in the business

of effecting transactions in securities," and was not, therefore a "stockbroker."

## 1. *Slatkin had "customers."*

[15] A "customer" includes an "entity that has a claim against a person arising out of . . . a deposit of cash, a security, or other property with such person for the purpose of purchasing or selling a security." 11 U.S.C. § 741(2)(B)(ii). The Johnsons, like Slatkin's other investors, deposited funds with Slatkin for the purpose of having him purchase securities with those funds. The Johnsons were therefore "customers" of Slatkin. *See* 11 U.S.C. § 741(2)(B)(ii); *Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 106 F.3d 1255, 1260 (6th Cir. 1997) ("*In re Baker & Getty*") (holding that defrauded investors who deposited funds with the debtor for the purpose of having the debtor purchase securities were "customers" of the debtor); *cf. Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990) (holding that a debtor's clients were not "customers" where the clients *did not provide* the debtor with a reservoir of cash from which to purchase securities, but instead paid the debtor only after the debtor had purchased the securities).

The Trustee does not contest that the Johnsons fall within the plain language of "customer" under § 741(2)(B)(ii). The Trustee argues, however, that an "ordinary-course-of-business" requirement should be read into the definition of "customer" under § 741(2)(B)(ii). The Trustee reasons that because the definition of "customer" under § 741(2)(A)[5]

---

[5]Section 741(2)(A) defines a "customer" as including an

entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity —

includes an "ordinary-course-of-business" requirement, Congress clearly intended to include that same requirement in the § 741(2)(B)[6] definition of "customer." The Trustee further argues that § 741(2)(B)'s definition of customer does not make sense unless it includes an "ordinary-course-of-business" requirement. We disagree.

The text of § 741(2)(B), combined with the legislative history, makes clear, that the definition of "customer" turns not on the status or intent of the debtor, but instead on the purpose of the investor. *See In re Baker & Getty*, 106 F.3d at 1260 (citing H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 6223-27). "An investor qualifies as a customer [under § 741(2)(B)(ii)] when the investor deposits money or securities with the debtor with the expectation that the debtor purchase stock or trade securities." *Id.* "It is the act of entrusting the cash to the debtor for the purpose of effecting securities transactions that triggers the customer status provisions. Whether the debtor plans to purchase securities with the funds

---

> (i) for safekeeping;
>
> (ii) with a view to sale;
>
> (iii) to cover a consummated sale;
>
> (iv) pursuant to a purchase;
>
> (v) as collateral under a security agreement; or
>
> (vi) for the purpose of effecting registration of transfer . . . .

11 U.S.C. § 741(2)(A).

[6]Section 741(2)(B) defines "customer" as including an

> entity that has a claim against a person arising out of —
>
>> (i) a sale or conversion of a security received, acquired, or held as specified in subparagraph (A) of this paragraph; or
>>
>> (ii) a deposit of cash, a security, or other property with such person for the purpose of purchasing or selling a security.

11 U.S.C. § 741(2)(B).

or defraud investors is irrelevant." *Id.* (citations, quotations, and alterations omitted).

2. *Slatkin was not "engaged in the business of effecting transactions in securities."*

**[16]** To be a "stockbroker," Slatkin not only must have had "customers," he also must have "engaged in the business of effecting transactions in securities." 11 U.S.C. § 101(53A)(B). To determine whether Slatkin was "engaged in the business of effecting transactions in securities," we begin by giving this language its ordinary and plain meaning. *See Salazar v. McDonald (In re Frank Salazar)*, 430 F.3d 992, 995 (9th Cir. 2005). If the language is clear and unambiguous, "we look no further when we seek to ascertain its meaning." *See id.*

**[17]** The operative term of the language "engaged in the business of effecting transactions in securities" is "effecting." *See In re Baker & Getty*, 106 F.3d at 1260. "Effect" is commonly understood to mean "[t]hat which is produced by an agent or cause; a result, outcome, or consequence"; or "[t]o bring about; to make happen." Black's Law Dictionary (8th ed. 2004). Applying this common meaning of the term "effect," the relevant question is whether Slatkin was in the business of making securities transactions happen. *See In re Baker & Getty*, 106 F.3d at 1260. We hold that he was not.

**[18]** It is undisputed that Slatkin was not a licensed stockbroker. It also is undisputed that, to the extent he did buy securities with investor funds, he did so by contacting a stockbroker who, in turn, would effect or make the requested trade in securities happen. Further, Slatkin purchased and held the securities that he did purchase in his own name, and not in the name of his investors. Finally, there is no evidence that Slatkin had the ability to effect or make a trade in securities happen, or that he held himself out as having such an ability. Under these circumstances, Slatkin was not "engaged in the business of effecting transactions in securities."

The Johnsons rely heavily on *In re Baker & Getty* in argu-
ing that Slatkin was a "stockbroker." In that case, the Sixth
Circuit held that the debtors were "stockbrokers" under
§ 101(53A). 106 F.3d at 1256. The debtors included three
entities and individual debtor, Cordek, and his wife. Cordek,
along with another individual, formed the three debtor enti-
ties, referred to collectively as "B&G." *Id.* B&G solicited cus-
tomers to purchase securities, advertised itself as a licensed
broker-dealer, and encouraged its stockbrokers to tell prospec-
tive customers that B&G was a full-service brokerage firm
capable of conducting transactions in-house. *Id.*

In reality, B&G was not a licensed broker-dealer and could
not conduct transactions in-house. *See id.* at 1257. Instead,
B&G employed Mutual Services, a licensed broker-dealer, to
conduct trades through a clearing house. *Id.* Typically, B&G
stockbrokers, who were also registered representatives of
Mutual Services, placed orders with Mutual Services and
Mutual Services would clear the trades through a clearing
house. *Id.* After a trade was executed, Mutual Services would
provide a confirmation slip to both the investor and the B&G
stockbroker, and commission checks to B&G stockbrokers.
*Id.* Thus, although investors who purchased stock from B&G
licensed stockbrokers received valid securities, they received
the securities without knowledge of B&G's actual status. *Id.*

At the same time that the B&G licensed stockbrokers were
conducting legitimate business, Cordek was operating a clas-
sic Ponzi scheme, pocketing money he received from inves-
tors and paying investors using funds received from new
investors. *Id.* at 1256-57.

The court held that B&G was "engaged in the business of
effecting transactions in securities." *See id.* at 1260, 1262.

> The facts in the record indicate that B&G effected
> securities transactions, albeit with the aid of Mutual
> Services. In particular, B&G enticed customers to

invest their money through B&G. Investors, lured in by B&G's corporate offices and advertisements representing B&G as a licensed broker-dealer, placed money in the hands of B&G stockbrokers for the purpose of purchasing stock. B&G stockbrokers told investors that B&G was a full-service brokerage firm, capable of conducting securities transactions in-house. B&G stockbrokers, who were also registered representatives of Mutual Services, placed orders for trades through Mutual Services. All the while, B&G had taken steps to substitute itself in the position of Mutual Services by applying for licensing as a broker-dealer with the Securities and Exchange Commission. Because B&G's stockbrokers were registered representatives of Mutual Services, they could use Mutual Services to execute trades, yet maintain the strong client base should B&G become a licensed broker-dealer. First, B&G was responsible for soliciting investors, without which there would have been no securities transactions. Second, B&G's stockbrokers, as registered representatives of Mutual Services, executed transactions in securities. Finally, from the beginning, B&G operated with the intention that it replace Mutual Services upon licensing. We conclude, therefore, that B&G's activities effected transactions in securities.

*Id.* at 1262 (citation omitted).

The court rejected the defrauded investors' argument that B&G was not a stockbroker as to their transactions because no transaction in securities had been "effected." *See id.* "Section 101(53A) defines a stockbroker not on a customer-by-customer basis, but as one 'engaged in the business . . . .' " *Id.* "In other words, we look not to a single maverick transaction when determining whether a person is a stockbroker but, instead, to the underlying business at issue." *Id.* Except for

Cordek's dealings with the defrauded investors, "B&G conducted legitimate business with *all* its customers. B&G, having achieved 'stockbroker' status by virtue of its lawful business, has such status as to [the defrauded investors] as well." *Id.*

The analysis in *In re Baker & Getty* confirms our conclusion that Slatkin *was not* "engaged in the business of effecting transactions in securities." In the present case, we do not have a situation where all but a very few, select transactions conducted by the debtor were legitimate. Here, all but a very few of the transactions conducted by Slatkin were *illegitimate*. *See id.* at 1262 (noting that, except for the business conducted by Cordek with the defrauded investors, B&G conducted legitimate business with *all* its customers). We also do not have, in the present case, a debtor who held himself out as being a licensed, "full-service brokerage firm, capable of conducting securities transactions in-house"; who was capable of executing trades through a clearing house; who was in the process of seeking to be licensed as a broker-dealer; or who purchased and sold securities in the names of the investors. *See id.* at 1256, 1262.

**[19]** We hold that Slatkin was not "engaged in the business of effecting transactions in securities" and therefore was not a "stockbroker."

   3. *Mr. Johnson's declaration does not raise a genuine issue of material fact as to whether Slatkin was a "stockbroker."*

The Johnsons argue that Mr. Johnson's declaration raises a genuine issue of material fact as to whether Slatkin was a "stockbroker." We disagree.

Mr. Johnson's declaration simply indicates that Slatkin made large trades of shares; that these trades were made by Slatkin through Slatkin's stockbrokers; that Slatkin made

these trades in his own name; that Slatkin would sometimes share or pass on to the Johnsons what was purported to be "profits" resulting from Slatkin's trades; and that Mr. Johnson believed that Slatkin was acting as his stockbroker. These facts, taken as true, do not demonstrate that Slatkin was acting as a stockbroker.

First, that Slatkin made trades through stockbrokers rather than effecting trades himself, and made trades in his own name rather than in his investors' names, demonstrates that Slatkin's *stockbrokers* were engaged in the business of effecting transactions in securities.

Second, that Slatkin would share or pass on to the Johnsons purported profits from investments does not create an issue of fact in light of Slatkin's admission that he paid purported profits to investors using funds received from other investors.

Third, Mr. Johnson's subjective belief that Slatkin was acting as his stockbroker is relevant only to the question of whether the Johnsons were a "customer" of Slatkin. It is not relevant to the "engaged in the business of effecting transactions in securities" inquiry. *See In re Baker & Getty*, 106 F.3d at 1262. Mr. Johnson's belief does not, therefore, create a genuine issue of material fact. *See id.*

E. *The bankruptcy court properly awarded prejudgment interest.*

We review for abuse of discretion the bankruptcy court's award of prejudgment interest, but review de novo whether an award of prejudgment interest is authorized under state or federal law. *See Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 954 (9th Cir. 2008).

1. *Prejudgment Interest under State Law.*

**[20]** Section 3288 of the California Civil Code provides: "In an action for the breach of an obligation not arising from

contract, and in every case of oppression, fraud, or malice, interest may be given, *in the discretion of the jury*." Cal. Civ. Code § 3288 (emphasis added). The Johnsons argue that only a jury can award prejudgment interest under § 3288, and that the bankruptcy court did not have the authority to award prejudgment interest. We disagree and hold that when a court has granted judgment as a matter of law on all substantive issues, the court has authority to award prejudgment interest under § 3288. *Cf. L.A. Nat'l Bank v. Bank of Canton*, 37 Cal. Rptr. 2d 389, 400-01 (Cal. Ct. App. 1995) (finding award of prejudgment interest by trial court after summary judgment to be under section 3288 as opposed to another section of the civil code); *Bass v. Youngblood*, 34 Cal. Rptr. 326, 333 (Cal. Ct. App. 1963) (upholding a trial court's award of prejudgment interest under section 3288 following a court trial).

*Barry v. Raskov*, 283 Cal. Rptr. 463 (Cal. Ct. App. 1991), relied on by the Johnsons, is not contrary to our holding. In that case, a jury trial was held and the jury returned a verdict in favor of the plaintiff. *Id.* at 465. The trial court, on its own, awarded prejudgment interest. *Id.* The California Court of Appeals held that the trial court "had no authority to usurp the discretion conferred on the jury" by § 3288, and that the court's award of prejudgment interest was therefore error. *Id.* at 468-69.

Unlike *Barry*, in the present case there has not been, and will not be, a jury trial. There is nothing in *Barry* that indicates that, in a situation involving a grant of judgment as a matter of law, only a jury, and not a court, can award prejudgment interest under § 3288.

   2.  *Prejudgment Interest under Federal Law*.

**[21]** Finally, the Johnsons argue that because they have demanded a jury trial, they are entitled to have a jury decide the issue of prejudgment interest under federal law. We dis-

agree, and hold that the bankruptcy court had the authority to award prejudgment interest under federal law.

*Osterneck v. Ernst & Whinney*, 489 U.S. 169 (1989), relied on by the Johnsons, does not support their argument. *Osterneck* indicates that, even after a jury trial, the court, rather than the jury, will decide the issue of prejudgment interest under federal law. *See id.* at 176 ("In deciding if and how much prejudgment interest should be granted, a district court must examine — or in the case of a postjudgment motion, reexamine — matters encompassed within the merits of the underlying action.").

AFFIRMED.