**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>WELSCORP, INC.,<br>　　　　　　Debtor. | BAP No. NV-23-1030-BGC<br><br>Bk. No. 19-18056-ABL |
| STEVEN LORE,<br>　　　　　　Appellant,<br>v.<br>LENARD SCHWARTZER, Chapter 7<br>Trustee,<br>　　　　　　Appellee. | Adv. No. 21-01175-ABL<br><br>**MEMORANDUM**∗ |

Appeal from the United States Bankruptcy Court
for the District of Nevada
August B. Landis, Chief Bankruptcy Judge, Presiding

Before: BRAND, GAN, and CORBIT, Bankruptcy Judges.

## INTRODUCTION

Appellant Steven Lore appeals an order granting appellee, chapter 7[1]

trustee Lenard Schwartzer ("Trustee"), summary judgment against him under

§§ 544, 548,[2] and 550 and Nevada law, NRS § 112.180(1)(a). Trustee sought to

---

∗ This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "NRS" references are to the Nevada Revised Statutes.

[2] To the extent the bankruptcy court granted relief under § 548, it erred. Trustee did not seek relief under § 548 in his complaint, and none of the transfers to Lore occurred

1

avoid and recover the debtors'[3] actual fraudulent transfers to Lore in furtherance of an alleged Ponzi scheme. Because Lore failed to establish that any genuine issue of material fact existed for trial, particularly whether the debtors were running a Ponzi scheme, the bankruptcy court did not err in granting Trustee summary judgment and entering a judgment against Lore for $227,565.16. Accordingly, we AFFIRM.

## FACTS

**A.    Events leading to the adversary complaint against Lore**

The relevant facts are essentially undisputed. From August 2014 until shortly before creditors filed their involuntary chapter 7 petitions on December 20, 2019, debtors Welscorp, Inc. and its affiliates and principals (collectively, "Debtors") operated an investment scheme that offered investors 250% to 600% returns from a pooled investor fund used to bet on sporting events. Debtors' principals, John F. Thomas, III (aka Jonathan West, John Rodgers, John Frank, and John Marshall) and Thomas Becker, claimed to have created a proprietary sports betting algorithm that was highly accurate in predicting the outcome of sporting events.[4] Thomas and Becker, through

---

within two years of the petition date. However, such error was harmless since the relevant transfers occurred within four years of the petition date and relief was warranted under Nevada law and § 544(b)(1).

[3] Debtors include several entities and their principals: Welscorp, Inc.; Einstein Sports Advisory Ltd.; QSA LLC; Wellington Sports Club LLC; Vegas Basketball Club LLC; Vegas Football Club LLC; Boston Biometrics LLC; Sports Psychometrics LLC; ESA Ltd.; No-More-Bad-Hires, Inc.; John F. Thomas, III, and Thomas Becker.

[4] In 1991, Thomas and Becker were convicted of felony money laundering and conspiracy arising from another fraudulent scheme. Thomas used the alias "Jonathan West" during the time Debtors ran their sports betting investment scheme.

the Debtor entities and the services of their broker-agents, raised at least $29.5 million from 600 investors in more than 40 states with their "low-risk, high-yield" sports betting investment scheme. The individual investors deposited amounts ranging from less than $10,000 to over $500,000. Debtors did not do any vetting of their investors to determine if they were accredited and could survive a financial loss. Many investors were unsophisticated and placed a substantial percentage of their net worth (including savings and retirement accounts) with Debtors.

Debtors had more than 150 brokers and agents. Each broker signed a "sports investment broker agreement" agreeing to "promote, market, and sell" the investor agreements in return for a certain percentage of front-end and back-end commissions. For every agent a broker brought in, the broker received a certain percentage of the agent's commissions as well.

Debtors promised their investors "absolute security and instant liquidity," compounding returns that grow "a quadrillion times faster" than Warren Buffet's investments, or total growth of funds "a quintillion-fold". The investor agreements set forth how Debtors would grow the investor's initial investment to a target amount. Once the target was reached, the investor could cash out and get 50% of the target amount; Debtors would get the other 50%. An investor could also choose to roll over some or all of the earnings into a new agreement.

Prospective investors were lured into investing through personalized access to a website that would provide them with "demonstrations" of how

3

their potential investment would grow over time. Once committing money to Debtors, the investors' login credentials allowed them to monitor bets and track their individual "winnings" online.

The websites, however, contained incorrect, falsified, or mismanaged accounting information. For example, on February 11, 2017, investors were shown that their accounts increased by $5,344,262, but betting slips from that day showed they earned only $105,782.50. On May 12, 2018, investors were shown that betting generated $60.5 million in profits, but betting slips from that day showed only $119,536.40 in actual winnings. Many investors chose to reinvest their "winnings" because they were impressed with the rate of growth they saw in their personalized spreadsheets on the website. In reality, Debtors' sports betting activity generally lost money. Thomas and Becker never achieved the winning rates represented to investors.

When investors demanded payment, Thomas and Becker would say they had the funds but often claimed they could not pay for a host of reasons, such as the winnings were in cash and they could not deposit large amounts of cash into bank accounts for fear of being prosecuted for money laundering or other crimes. Most, if not all, investors were not paid out the full balance shown in their online accounts, and many were not paid back anything at all, even their initial investments, despite their accounts reflecting much higher amounts. If an investor was paid, it was frequently with money from other investors, not winnings from sports betting. There was evidence that some of these investors were paid because Debtors' brokers suggested that doing so

4

could lead to a larger amount of new money coming in. The investor agreements did not disclose any use of investor funds other than for betting, and investors did not know their funds were being used to pay returns to other investors – i.e., Ponzi payments – or being used by Debtors' principals for personal expenses and for payment of broker commissions.

Lore was one of Debtors' brokers and received commissions (and other compensation) for bringing in new investors, including his family and friends. Lore met Thomas through a Craigslist ad in February 2016. Lore admitted that he knew about Thomas's criminal past involving similar fraud schemes. Lore is still in regular contact with Thomas.

In August 2019, the Securities and Exchange Commission ("SEC") filed a civil action against Debtors and some associated brokers in the District of Nevada, alleging multiple securities violations. The SEC alleged that Debtors conducted little sports betting and used only a small portion of investor funds for betting. Instead, investor funds were misappropriated to fund Thomas and Becker's personal lifestyles, pay commissions to brokers and agents, or make Ponzi payments. The SEC alleged that Thomas and Becker spent more than 85% of investor funds on something other than betting. In addition, none of Debtors' investment offerings were registered with the SEC, and none of the named salespersons were registered securities brokers.

The SEC also obtained an injunction to enjoin Debtors from any further investment activities and to freeze their monies and assets. In support, the SEC submitted a declaration from Deborah Russell, a long-time staff

accountant in the SEC's Division of Enforcement. Based on her extensive review of Debtors' bank records and her reconstruction of Debtors' books and records, Russell opined that Debtors were running a Ponzi scheme. Russell concluded that, at most, $4,480,847.07 (or 15%) of the nearly $30 million Debtors raised from investors may have been used for betting activities on their behalf. Russell further concluded that at least $11,616,332.72 of the $13,222,296.55 paid to investors (88%) was in Ponzi payments. Thomas and Becker asserted their Fifth Amendment rights during questioning at their depositions, failing to answer even basic questions about their enterprise.

Ultimately, Debtors defaulted in the SEC action and final judgments of default were entered against them in April 2021. The default judgments enjoined Thomas and Becker from selling securities in the future and ordered them to disgorge over $8 million of illegal profits and pay a civil penalty of $4 million. The Ninth Circuit Court of Appeals affirmed the default judgments in June 2022.

The state of Oregon also prosecuted Becker and some of the Debtor entities for state securities violations involving two investors. In 2018, Becker signed a consent order admitting to the violations. He was fined $35,000.

In October 2020, a grand jury indicted Thomas and Becker for thirteen counts of wire fraud and conspiracy to commit wire fraud in connection with the sports betting investment scheme, which was described in the indictment as a "Ponzi scheme." Those criminal charges are still pending.

////

6

**B.      Adversary complaint against Lore**

Trustee filed an adversary complaint against Lore, seeking to avoid and recover what he alleged were Debtors' actual fraudulent transfers of investor funds to Lore under § 544(b)(1) and NRS § 112.180(1)(a).[5] Trustee alleged that Debtors' sports betting investment scheme was a Ponzi scheme and that Lore, as a broker for Debtors, was among the highest paid transferees in the fraud. Between August 3, 2016[6] and December 12, 2017, Lore received $227,565.16 in commission payments and other compensation in exchange for his services which Trustee alleged perpetuated Debtors' Ponzi scheme ("Net Transfers").

Lore denied that Debtors ran a Ponzi scheme, and he took issue with Russell's opinion. Attached to his answer were betting slips for sporting events from February 11, 2017, which Lore implied proved that Debtors had not run a Ponzi scheme. Lore maintained that Trustee could not recover the transfers because they were made in exchange for value and he received them in good faith.

Trustee then moved for summary judgment. ("MSJ"). The MSJ was supported by a statement of undisputed facts, which in turn was supported by numerous documents, including evidence demonstrating that Debtors' sports betting investment scheme was a Ponzi scheme, and the amount of the

---

[5] Trustee also alleged a constructive fraudulent transfer claim under Nevada law. However, since he established an actual fraudulent transfer claim, we do not discuss the constructive fraud claim any further.

[6] Trustee's Exhibit D showing the payments to Lore contained errors. The first two checks listed for January 23 and February 3, 2016, were actually drafted on January 23 and February 3, 2017. So, the first transfer to Lore was on August 3, 2016.

Net Transfers to Lore. Trustee argued that the Net Transfers were made by Debtors with actual intent to defraud existing and future investors in furtherance of their Ponzi scheme. Trustee argued that Lore had no affirmative defense to the transfers under Nevada law; he did not give reasonably equivalent value in exchange for the transfers because he was paid that money solely for bringing in new investors in furtherance of the fraud, and he lacked good faith. Lore admitted that he did not see the betting take place, did not know who placed bets, did not know how betting tickets were handled, stored, or accounted for, and only saw one set of betting tickets provided to him by Thomas, which Lore admitted he did not know the value of or how to calculate their value. Further, argued Trustee, Lore had no credible explanation for why hundreds of investors were not paid returns on time or at all.

Trustee's expert accountant, Marc Ross, reviewed accountant Russell's declaration and the "tens of thousands of pages" of supporting documentary evidence from the SEC's litigation against Debtors. Ross also conducted his own independent investigation. While Ross conceded that he could not review Russell's privileged work product, he did not doubt the validity of her conclusions. Ross shared Russell's opinion that Debtors were running a Ponzi scheme that defrauded their investors out of millions of dollars and allowed them to fund lavish lifestyles for Thomas and Becker and their families. Ross opined that approximately $5.9 million (or 20%) of the nearly $30 million raised from investors may have been placed on actual bets, either for the

8

benefit of the investors or Debtors' principals, and that the vast majority of funds returned to investors as "winnings" were actually funded by Ponzi payments; there was no evidence of deposits of winnings into Debtors' bank accounts that would have accounted for payment of any significant returns to investors. Ross opined that Debtors could not have done sufficient betting to pay the returns promised by the contracts and represented on the websites.

Lore opposed the MSJ. He did not file a statement of undisputed facts or properly respond to Trustee's statement as required by local rule. Lore disputed Trustee's assertion that Debtors ran a Ponzi scheme. He argued that the existence of a Ponzi scheme had not been proven in any court and that, based on over 5,000 betting picks he witnessed in real time, there was "no way" Debtors "could fake their ability to make a very high percentage of winning picks." Lore argued that none of Trustee's exhibits proved Debtors ran a Ponzi scheme, but he disputed only a portion of them and did not offer any of his own exhibits. Lore also did not address or deny the specific facts Trustee stated in support of the conclusion that Debtors ran a fraudulent and illegal Ponzi scheme.

In reply, Trustee argued that Lore had failed to show that any genuine issue of material fact was in dispute as to the Ponzi scheme, which is the only fact Lore disputed. Trustee argued that Lore's position that Debtors were engaged in a legitimate business was highly implausible and not supported with any evidence. Trustee disputed Lore's claim that Debtors' business was legitimate because of the high percentage of winning picks made. Debtors,

9

argued Trustee, did not commit fraud with fake picks; they committed fraud by misrepresenting the profits those picks could generate, the effectiveness of their betting strategy, and the amount of betting performed and returns actually won. It was entirely possible for Debtors to have transparent, high-win-rate picks and still commit sports-betting fraud.

After a hearing, the bankruptcy court entered its oral ruling on the record granting the MSJ in its entirety. Lore did not order a transcript. The court's written order incorporated its oral ruling by reference and stated that: (1) Debtors made the Net Transfers to Lore with actual intent to hinder, delay, or defraud creditors; (2) the Net Transfers were deemed avoided; and (3) Trustee shall recover from Lore $227,656.16, plus fees, costs, and prejudgment interest. This timely appeal followed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court err when it granted summary judgment in favor of Trustee?

## STANDARDS OF REVIEW

We review the appeal of a summary judgment ruling de novo. *Stadtmueller v. Sarkisian (In re Medina)*, 619 B.R. 236, 240 (9th Cir. BAP 2020), *aff'd*, No. 20-60045, 2021 WL 3214757 (9th Cir. July 29, 2021). Under de novo review, we view the evidence in the light most favorable to the nonmoving

party to determine whether the moving party was entitled to judgment as a matter of law because no genuinely disputed issues of material fact needed to be tried. *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 230 (9th Cir. BAP 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008). "When the material facts are not in dispute, our only function is to determine whether the bankruptcy court correctly applied the law." *Patow v. Marshack (In re Patow)*, 632 B.R. 195, 202 (9th Cir. BAP 2021) (citation omitted), *aff'd*, No. 21-60051, 2022 WL 2256325 (9th Cir. June 23, 2022).

## DISCUSSION

**A.     Incomplete appellate record**

Lore had the burden of filing an adequate record to allow review of the order he appeals. *Drysdale v. Educ. Credit Mgmt. Corp (In re Drysdale)*, 248 B.R. 386, 388 (9th Cir. BAP 2000). Although we ordered him to do so, Lore failed to order and submit a transcript of the bankruptcy court's oral ruling granting the MSJ. When findings of fact and conclusions of law are made orally on the record, a transcript of those findings is mandatory for appellate review. *McCarthy v. Prince (In re McCarthy)*, 230 B.R. 414, 416-17 (9th Cir. BAP 1999). The lack of the transcript hinders our appellate review.

In addition, Lore's opening brief does not contain a statement of facts, standard of review, summary of the argument, or any citations to legal authorities. *See* Rule 8014. Moreover, he attempts to raise issues on appeal that were not presented to the bankruptcy court. Despite his pro se status, Lore must follow the same rules of procedure that govern other litigants.

11

*Warrick v. Birdsell (In re Warrick),* 278 B.R. 182, 187 (9th Cir. BAP 2002).

Based on Lore's noncompliance with the rules and his failure to provide a sufficient record, we can dismiss the appeal or summarily affirm the bankruptcy court's ruling. *Kyle v. Dye (In re Kyle),* 317 B.R. 390, 393-94 (9th Cir. BAP 2004), *aff'd,* 170 F. App'x 457 (9th Cir. 2006). However, before summarily affirming or dismissing, we may exercise our discretion and consider whether an informed review can be conducted with the incomplete record provided. *Id.* Here, we will exercise our discretion to examine what record we have been provided, keeping in mind that we need only look for any plausible basis upon which the bankruptcy court could have made the decision it did. *In re McCarthy,* 230 B.R. at 417. "If we find any such basis, then we must affirm." *Id.* We find such basis here.

## B.    Summary judgment standards

Civil Rule 56(a), applicable here by Rule 7056, provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute over material facts is genuine where a reasonable jury could return a verdict for the nonmoving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Once the movant has come forward with uncontroverted facts entitling it to relief, the burden shifts to the nonmovant to establish that there is a specific and genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 n.3 (1986). The nonmovant "may not rely on denials in the

12

pleadings but must produce specific evidence, through affidavits or admissible discovery materials, to show that the dispute exists." *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008) (citation omitted). Conjecture, surmise or "metaphysical doubt" by the nonmovant of the movant's assertions will not defeat a summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant's evidence must be probative. *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 165 (9th Cir. BAP 1999). Even in cases where intent is at issue, summary judgment may be appropriate if the nonmovant rests merely upon conclusory allegations, improbable inferences, and unsupported speculation. *Id.*

In deciding whether material factual issues exist, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88. However, the court is required to do so only in circumstances where a fact specifically averred by the moving party is contradicted by specific evidence submitted in opposition to the motion. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). If a motion for summary judgment is properly supported and the nonmovant does not set forth specific facts showing a genuine issue for trial, summary judgment must be entered. Civil Rule 56(a); Rule 7056.

**C.    The bankruptcy court did not err in granting summary judgment.**

To prevail on his fraudulent transfer claim under Nevada law, Trustee had to show that:

(1) Debtors transferred an interest in property to Lore;

(2) Debtors transferred the property during the four years prior to the petition date; and

(3) Debtors made the transfer with actual intent to hinder, delay, or defraud a present or future creditor.

NRS § 112.180(1)(a); *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 218-19 (Bankr. D. Nev. 2007); § 544(b)(1) (authorizing trustee to avoid fraudulent transfers under state law). "[T]he required intent to hinder, delay or defraud is the debtor's; no collusion with the transferee is necessary." *In re Nat'l Audit Def. Network*, 367 B.R. at 221. It was undisputed that the Net Transfers to Lore were Debtors' property, and that they were made within four years of the petition date. The only dispute was whether Debtors made the Net Transfers with actual intent to hinder, delay, or defraud a creditor.

Trustee asserted that Debtors were running a Ponzi scheme with their sports betting enterprise and that the Net Transfers to Lore were made in furtherance of that scheme. The Ninth Circuit has defined a Ponzi scheme as:

> an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to the previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.

*Hayes v. Palm Seedlings Partners-A, L.P. (In re Agric. Rsch. & Tech. Grp., Inc.)*, 916 F.2d 528, 531 (9th Cir. 1990).

"Transfers made in furtherance of Ponzi schemes have achieved a special status in fraudulent transfer law." *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen),* 199 B.R. 709, 717 (9th Cir. BAP 1996). The mere existence of a Ponzi scheme is sufficient to establish the debtor's actual intent to hinder, delay, or defraud creditors under § 548(a)(1) or a state's equivalent fraudulent transfer statute. *Johnson v. Neilson (In re Slatkin),* 525 F.3d 805, 814 (9th Cir. 2008); *Barclay v. Mackenzie (In re AFI Holding, Inc.),* 525 F.3d 700, 703 (9th Cir. 2008); *Hayes,* 916 F.2d at 534-35; *In re Cohen,* 199 B.R. at 717. And once the existence of a Ponzi scheme is established, payments received by the transferee that exceed his or her initial investment are deemed to be fraudulent transfers as a matter of law. *In re Slatkin,* 525 F.3d at 814. That is because the source of the so-called "profits" received by the transferee is "a theft by the debtor from other investors." *Id.* at 815 (cleaned up).

In support of his position that Debtors were running a Ponzi scheme, Trustee set forth uncontroverted evidence from accounting experts Russell and Ross that only 15% to 20% of the nearly $30 million Debtors raised from investors may have been used for betting activities on their behalf, and that the vast majority of the money paid to investors was by Ponzi payments. Lore argues that the bankruptcy court erred in determining that Debtors were running a Ponzi scheme. Given the record, we disagree.

Other than denying that Debtors were running a Ponzi scheme, Lore did not present an affidavit or any other admissible evidence specifically challenging any of the facts Trustee set forth supporting a Ponzi scheme.

15

Trustee's evidence demonstrated the existence of a Ponzi scheme, and Lore failed to produce any specific evidence, through affidavits or admissible discovery materials, that created a genuine issue of material fact as to that issue. The one-day's betting tickets he submitted and his unsupported "say so" failed to create a triable issue of material fact. What betting did occur did not generate meaningful profits and could not have paid the promised returns, and no significant deposits were made that would evidence other successful betting activity. If Debtors were as successful as Lore claimed, then it did not follow that hundreds of investors were not paid returns on time, or at all. Despite his diligence, Trustee has been unable to locate any significant assets for Debtors' victims.

Accordingly, the bankruptcy court did not err in determining that Debtors were running a Ponzi scheme. We reject Lore's argument that he was deprived of any opportunity to challenge the Ponzi presumption. Because Debtors were running a Ponzi scheme, the payments made to Lore in furtherance of that scheme were actual fraudulent transfers as a matter of law. *In re Slatkin*, 525 F.3d at 814. Lore's argument that the transfers would be considered illegal only if Debtors either pleaded guilty to or were found guilty of running a Ponzi scheme is without merit. No guilty plea or verdict in a criminal case is needed to determine that the transfers to Lore were illegal. The bankruptcy court had full authority to decide as a civil matter whether or not Debtors were running a Ponzi scheme.

Lore argues that the bankruptcy court erred in finding that he was

16

a "net winner." Lore is unable to cite in the record where the court made this finding because he failed to submit a transcript of the court's oral ruling. He also argues that Trustee relied entirely on Russell's testimony for the case against him, but that is untrue. Trustee retained his own accountant who shared Russell's opinion that Debtors were running a Ponzi scheme. Further, Lore never contested the amount Trustee asserted Lore received in commissions for bringing other investors into the scheme, so he cannot do so now on appeal.

Next, Lore argues that the bankruptcy court erred in finding that the law allowing claw backs is constitutional. Lore never raised this issue before the bankruptcy court. Therefore, we need not consider it. *Smith v. Marsh,* 194 F.3d 1045, 1052 (9th Cir. 1999) (we generally will not consider arguments raised for the first time on appeal). In any case, Lore has failed to cite a single case calling into question the constitutionality of fraudulent transfer avoidance, which every state has adopted. We also reject his related claim that the bankruptcy court erred in finding that the law permits claw backs further back than 90 days prior to the bankruptcy filing. NRS § 112.230(1)(a) provides for a four-year reach back from the petition date.

Finally, Lore argues that the bankruptcy court erred in finding that the settlements were not arbitrary. Here, Lore seems to be asserting that Trustee pursued individuals for fraudulent transfer claims differently, settling some cases for less money than what was transferred or dismissing some cases altogether, which he views as unfair. We fail to see how this, even if true, has

17

any relevance. And it is certainly nothing that Lore raised before the bankruptcy court in opposing the MSJ. Lore also lacks standing to attack orders out of other adversary proceedings, especially when he made no oppositions to those settlements and has alleged no particular injury or impact on his own proceedings.

There are defenses to an actual fraudulent transfer under Nevada law. NRS § 112.220(1) provides that such transfers are not avoidable against a transferee who took in good faith and for a reasonably equivalent value. Once Trustee met his burden of showing that the Net Transfers were made with the requisite intent, it was Lore's burden to prove the existence of good faith and reasonably equivalent value. *In re Nat'l Audit Def. Network,* 367 B.R. at 224.

Lore does not raise this issue on appeal. We can only assume the bankruptcy court determined that he failed to show there were any triable issues of fact regarding reasonably equivalent value or his good faith for the Net Transfers. Even if Lore could arguably show good faith, he cannot show reasonably equivalent value. Transfers from a Ponzi scheme given in exchange for value, where that value is solely participation in or continuation of a Ponzi scheme, are made without reasonably equivalent value required to defend against liability. *Hoffman v. Markowitz,* 746 F. App'x 641, 642 (9th Cir. 2018) (holding that referral fees paid in exchange for referring others to the Ponzi scheme do not constitute "reasonably equivalent value") (citing *Warfield v. Byron,* 436 F.3d 551, 555, 560 (5th Cir. 2006) (holding that no reasonably equivalent value is exchanged when a broker is paid commissions for

18

bringing new investors into the Ponzi scheme because the funds received by the broker were funds skimmed from later investors' payments into the scheme; "It takes cheek to contend that in exchange for the payments [the broker] received, the . . . Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments.")).

There were no triable issues of fact that: (1) Debtors operated a Ponzi scheme; (2) the Net Transfers were made to Lore with actual intent to hinder, delay, or defraud Debtors' creditors in furtherance of that scheme and were avoidable under Nevada law; and (3) Lore had no defense to avoidance of the Net Transfers. Accordingly, the bankruptcy court did not err in granting Trustee summary judgment.

## CONCLUSION

For the reasons stated above, we AFFIRM.